IN THE

# Supreme Court of Georgia,

## AT ATLANTA.

## FEBRUARY TERM, 1883.

PRESENT—JAMES JACKSON, . . . . . . CHIEF JUSTICE.
        M. J. CRAWFORD,* . . . . . . . ASSOCIATE "
        SAMUEL HALL, . . . . . . . .    "    "
        M. H. BLANDFORD, . . . . . .    "    "

THE STATE OF GEORGIA *vs.* THE SOUTHWESTERN RAILROAD
AND *vice versa.*

[This case was argued at the last term, and the decision reserved. Judge BRANHAM, of the Rome circuit, presided in the place of JACKSON, Chief Justice, who was disqualified.]

1. That portion of the Southwestern Railroad extending from Macon to Fort Gaines, known as the main line, and also the section from Fort Valley to Columbus, which may be considered as a part of the main line by reason of its purchase under the act of March 4, 1856, and its consolidation with that road in 1868, except that portion of the line between Americus and Smithville (which is part of the old Georgia and Florida Railroad) is subject to a tax of one-half of one per cent. on its net annual income, and not to the *ad valorem* tax imposed on the property of the citizens of the state under general laws. That portion of the road which lies between Americus and Albany, and which became a part of the Southwestern Railroad by purchase, under the act of 1859 (p. 229); that portion known as the Arlington branch, extending from Albany to Arlington and recently built to Blakely; that portion known as the Cuthbert branch, extending from Cuthbert junction (one and a half miles from Cuthbert) to Eufaula, is subject to the *ad valorem* tax.

*Justice Crawford having died during the summer vacation, before the close of the February Term, 1883, Hon M. H. Blandford was elected to succeed him.

2. The negotiations between the two successive attorneys general and the attorney of the company in this case amounted to nothing more than the valuation by them of that portion of the road lying between Americus and Albany, conceded to be subject to the *ad valorem* tax, and an agreement to pay tax thereon. . If its effect were to release the company from *ad valorem* tax on the Arlington and Eufaula branches of the road, as well as to release it from further taxation on the Americus and Albany section for those years, it would be a mistake which might be corrected.

(*a.*) This was not an attempt to compromise a debt due the state at less than the amount due, nor at a less rate of taxation than that due, nor to release the company from the *ad valorem* tax charged by the act of 1874 on the Arlington and Eufaula branches. Were it otherwise, the attorney general had no power to make any such contract or compromise, or to release the company from any part of the *ad valorem* tax imposed.

(*b.*) Nor would the governor have power to make any such contract or release ; he could not do more than suspend the collection of the tax until the meeting of the next general assembly.

3. After executions for taxes had been issued against this company by the comptroller general, contested, carried to the Supreme Court of the United States, and two-thirds or more of the company's road and property had been relieved from the *ad valorem* tax, the company ought to have made a new or revised return. Having failed to do so, the comptroller general was authorized to correct the original returns and to assess that portion of the road and property subject to the tax from the best information he could procure, and order the fi. fas. to proceed for so much of the tax as was then due and unpaid. Had he done so, it would have been the act of the state.

(*a.*) But in this case the comptroller general did not, either personally or by ratifying the assessment of another, assess the property, as claimed by defendant. When the fact of agency is to be proved by the subsequent ratification and the adoption of the act by the principal, there must be evidence of previous knowledge on the part of the principal of all the material facts. If the material facts be either suppressed or unknown, the ratification is invalid.

(*b.*) Whether the comptroller general could, under any circumstances, delegate the power·conferred on him by law, or ratify in an informal way the act of another in such a matter. *Quære.*

4. If an unauthorized entry of settlement was placed upon *fi. fas.*, and they were placed by the clerk among the settled papers in his office, a petition to vacate such entry was a proper remedy.

5. *Fi. fas.* having been issued by the comptroller general under the act of 1874, and being before the court on issues involving payment and satisfaction, and the valuation of certain branches; with a condi-

tional tender of a balance which might be due, the whole case was before the court and jury; and the latter were authorized, under the charge, to assess the value of the property; and they were not limited to a mere determination of the question whether the company was liable to pay the tax, leaving the assessment to the comptroller general or assessors.

(a.) If §§839 and 840 of the Code apply at all to returns made to the comptroller general, there was no separate return of those portions of the road subject to the tax at an undervaluation.

(b.) Assessments of corporate property for tax accruing after the act of 1877 and that of 1878—Code, §§826 (d), 833 (a)—are subject to the provisions thereof; but these cases having arisen before the passage of those acts, are not subject to the objections of the dissenting opinion in 62 *Ga.*, 501.

6. While, in submitting the issues to the jury, it might have been an inappropriate form of expression for the judge to charge, "now there are these two propositions that are before you, one of the state claiming taxes, and one of a road that is trying to keep from paying the taxes"; still, taken in connection with the balance of the charge on this subject, the jury could not have misunderstood the questions submitted to them.

(a.) Two theories were submitted: first, that the state claimed that, in fixing the value of the section and branches of the road subject to tax, the jury should value the same in connection with and as a part of the whole road, according to the value of the whole line, estimating the value thereof according to the number of miles, by the *pro rata* of a single mile; second, that the company claimed that the section and branches should be valued at their separate, intrinsic, isolated value, apart from the connection of the main road:

*Held*, that this rule, in connection with the balance of the charge, is more favorable to the company than that recognized in 92 U. S., 605. In such cases, any rule is uncertain and unsatisfactory. No one given rule can with legal certainty be adopted; but the rule or rules submitted to the jury should let in all the evidence and every view of the subject that would shed light upon it.

7. The verdict of the jury is supported by the evidence.

(a.) The rule adopted by the jury is not fixed as an absolute rule for the future assessment of this property. It must be assessed at all times as the property of other people at its actual market value, and future returns are subject to the Code, §§826 (d.), 833 (a.)

8. Taxes are not debts in the ordinary sense of the word, so as to bear interest as liquidated demands. They are not contracts, either express or implied; they cannot be collected by suit at law in the absence of express statutory provision; and they are not the subject-matter of set-off. Our system for enforcing the payment of taxes is by penalties, and not by interest.

The State *vs.* The Southwestern Railroad and *vice versa.*

(*a.*) Where the circumstances raise an implied contract, or where there is an express contract to pay, the rule would be different; such as defaulters having in their hands public money, persons at whose instance or for whose benefit tax *fi. fas.* have been taken up and docketed, under Code §891 (a), and in cases of vexatious or unfounded litigation against the rights of the state. Such facts do not appear in this case, and the court was right in requiring interest to be written off from the verdict.

(*b.*) The taxes found to be due bear interest from the date of the verdict.

9. The record is indefinite as to the payment of a *pro rata* part of the income tax in 1874. If such payment was made, credit should be allowed for it.

10. There was no error in the remaining grounds of the motion for new trial.

11. Directions given to the court below.

May 1, 1883.

Railroads. Tax. State. Officers. Attorney General. Comptroller General. Governor. Interest. Charge of Court Before Hon. R. H. CLARK, Judge of city court of Atlanta, presiding in place of Judge HILLYER, disqualified. Fulton Superior Court. October Term, 1882.

Reported in the decision.

CLIFFORD ANDERSON, attorney-general; ROBERT TOOMBS; SAMUEL BARNETT, for the state.

A. R. LAWTON; R. F. LYON, *contra.*

BRANHAM, Judge.

This case was tried in Fulton superior court under the provisions of the act of 1874, and the jury, on the 28th of January, 1882, rendered a verdict against the defendant, the Southwestern Railroad Company, for $6,370.00 principal and $2,675.40 interest thereon for the balance of taxes for the year 1874, and for the same principal sum, and $2,229.50 interest thereon, for the balance of taxes for the year 1875, on the defendant's road.

The defendant moved for a new trial on the grounds set

forth in the motion, and the court, on the hearing thereof, granted a new trial, unless the plaintiff should, within fifteen days, write off from the verdict $2,480.00, this being the balance of taxes found by the jury to be due on the Americus and Albany branch of defendant's road, and should also write off all the interest found by the jury on both principal sums. This the plaintiff declined to do.

The defendant assigns error on the refusal of the court to grant a new trial on all the grounds contained in the motion, except the two on which the motion was, on terms, granted.

The plaintiff, by cross-bill of exceptions on the same record, assigns as error the order of the court granting a new trial on the terms stated. Both cases were argued together.

1. That portion of the Southwestern Railroad extending from Macon to Fort Gaines, known as its main line, and also the section from Fort Valley to Columbus, which may be considered as a part of its main line, by reason of the purchase thereof by the Southwestern Railroad Company, under the act of March 4th, 1856, and its consolidation with that road in 1868, except that portion of the line lying between Americus and Smithville, which is part of the old Georgia and Florida Railroad, is subject to a tax of one-half of one per cent. on its net annual income, and is not subject to the *ad valorem* tax imposed on the property of the citizens of Georgia by its general laws. That portion of the road heretofore constituting the Georgia and Florida Railroad, and which lies between Americus and Albany, and which became a part of the Southwestern Railroad, by purchase under the act of 1859, page 229; that portion known as the Arlington branch, extending from Albany to Arlington and recently built to Blakely; and that portion known as the Cuthbert branch, extending from Cuthbert junction, one and a half miles from Cuthbert, to Eufaula, is subject to the *ad valorem* tax. 92 U. S., 676; 64 *Ga.*, 783. Decision of this court, by Underwood, Judge, not yet published.[*]

[*] 68 *Ga.*, 311 (Rep.)

These rulings are well settled by the Supreme Court of the United States and by this court, and are no longer open questions.

The Americus and Albany section is thirty-six and a half miles long and cost to build it $435,800.00. The Arlington branch is thirty-five and a half miles long, excluding the extension to Blakely, which is not involved in this controversy, and cost to build it $460,000.00. The Cuthbert branch is twenty-three and a half miles long, and cost to build it nearly $500,000.00. On the 2d of October, 1874, the comptroller general issued a tax *fi. fa.* under the railroad tax act of 1874, against the Southwestern Railroad Company, for the *ad valorem* tax claimed to be due by that company for that year, on its road bed and appurtenances and other property for the sum of $28,203.29. On the 6th of December, 1875, the comptroller general issued a similar *fi. fa.* for the same sum for the taxes claimed to be due by the company for the year 1875. These *fi. fas.* were based on the returns of the president of the company, made in pursuance of the act of 1874, and from which it appeared that the whole property of the company was valued at $5,640,659.99. The *fi. fas.* were levied on a portion of the company's property, and affidavits of illegality filed as provided by the act of 1874, the levies suspended, the papers returned to Fulton superior court, and the cases tried, with the results heretofore stated.

A former case had been made by illegality to these same *fi. fas.* brought to this court (see 54 *Ga.*, 401), and reviewed by the Supreme Court of the United States in 92 U. S., 676. The object of that case was to determine whether the property of the company was liable to the *ad valorem* tax, notwithstanding its charter exemption beyond one-half of one per cent. on its net annual income, by reason of the consolidation of its road, in 1868, with the Muscogee Railroad, under the act of 1856. After the decision had been rendered on this question by the Supreme Court of the United States, in favor of the company, the following correspond--

ence took place between Attorney General Hammond and Ely, his successor, and General A. R. Lawton, the attorney of the company :

"ATLANTA, GEORGIA, May 25, 1876.
*"General A. R. Lawton, Savannah, Ga.:*

DEAR SIR—You have seen decision of Supreme Court of the United States, by this time, in Central Railroad tax case. We may have to contend further as to the Southwestern Railroad, unless we can agree upon the value of so much as is between Albany and Americus, which is taxable under act of 1859. Yours,

N. J. HAMMOND, *Attorney General.*"

"SAVANNAH, GEORGIA, May 29, 1876.
*" N. J. Hammond, Atlanta, Ga.:*

DEAR SIR—Your letter of the 21st inst. is received. I will ascertain all about the Southwestern Railroad from Americus to Albany, and when I know the facts, will advise a compliance with law; but don't be impatient now. Your litigation has resulted in substantial benefit to the state, and you should feel amiable.

Yours truly, A. R. LAWTON."

"ATLANTA, GEORGIA, September 5, 1876.
*"General A. R. Lawton, of Savannah, Ga., Atlanta, Ga.:*

DEAR SIR—I saw Mr. Powers, and he referred me to Mr. Boifeuillet. He wrote me as follows: This company (Southwestern Railroad Company) agreed, August 1st, 1856, to purchase the South Georgia and Florida Railroad from Americus to Albany for $400,000 (four hundred thousand dollars), payable in stock of this company at par, and payable when the road was finished in sections of thirteen miles each. The first payment was made when the road was finished to Sumter City, in December, 1856. Total cost of the road when finished to Albany, including extras, $435,800 (four hundred and thirty-five thousand and eight hundred dollars). Distance from Americus to Albany, thirty-six miles.

I find its history in compilation of the annual report of the Southwestern Railroad Company, pages 81, 236 and 237. As the stock is' as fixed in value as the other stock, I see no difficulty in our adjust-. ing the Southwestern Railroad tax on the basis of $435,800. Consider, and let me know your views on the subject.

Yours, N. J. HAMMOND, *Attorney General.*"

"ATLANTA, GEORGIA, November 29, 1876:
*"General A. R. Lawton, Savannah, Ga.:*

DEAR SIR—In a few weeks I must make my annual report. What about the new trial, Southwestern Railroad case? If you can agree upon taxing the old Florida and Georgia stock, we can adjust the matter. Respectfully,

N. J. HAMMOND, *Attorney General.*"

"Savannah, Georgia, December 11, 1876.
"*Hon. N. J. Hammond, Esq., Atlanta, Ga.:*

Dear Sir—Since I last saw you I have been "hurrying up" the prompt settlement of the tax cases now on hand, and the returns and payments for the present year. The proper officers of the railroad company are busily engaged in this service. The enclosed letter of Mr. McIntyre, the book-keeper, shows that the tax of 4-10 was first imposed on the return for each of the years 1874 and 1875, and then 25 per cent. added. How is this? The taxes were to be at the same rate as other property, and I am not aware of any authority for this addition of one-fourth. Perhaps there is some law or authority which has escaped me; but as we have acted in good faith and almost " 'pon honor," in this whole matter, I beg you to confer with the comptroller general and let it be understood. We are now anxious to settle up.

Yours truly,      A. R. Lawton."

"Savannah, Georgia, December 24, 1876.
"*Hon. N. J. Hammond, Atlanta, Ga.:*

Dear Sir—I return you the statement of items in settlement of the railroad tax case, with my signature to it. The "returns" have been duly made for this year's taxes, and the treasurer will at once pay the tax to the comptroller general.

Yours truly,      A. R. Lawton."

"Atlanta, Georgia, January 18, 1877.
"*General A. R. Lawton, Savannah, Ga.:*

Dear Sir—As my official term expires by the qualification of Hon. Robert Ely as my successor, to-day, in obedience to your request I herewith return yours of 10th inst. The offer I think a good one, all things considered, and if you wish, I think I can have it accepted.

Respectfully,      N. J. Hammond."

"Savannah, Georgia, January 16, 1877.
"*Hon. N. J. Hammond, Atlanta, Ga.:*

Dear Sir—I write hastily to say that if you will have time before you are "out of office," I will consent to the payment of tax at estimated value of $400,000 from Americus to Albany for the two years that executions were issued, and I will see the money paid promptly to *you*, so that those cases can be *finally disposed of at once.* This is a higher value than we would *now* return the property at, but will settle on those terms, as that was what we paid the South Georgia and Florida Railroad Company for it. If this letter does not reach you in time to *close the cases* during your term of office, please do not consider the letter official and return it to me.

Yours truly,      A. R. Lawton."

"Savannah, Georgia, January 20, 1877.
"*Hon. N. J. Hammond, Atlanta, Ga.:*

Dear Sir—Your letter of the 18th inst., returning mine of the 16th,

is just now before me. On consideration, I send you the letter again, and beg that you see the arrangement carried out for me as you kindly offer, and have *the cases finally closed.*

Very truly yours,                    A. R. LAWTON."

"ATLANTA, GEORGIA, January 26, 1877.
*"Hon. A. R. Lawton, Savannah, Ga.:*

DEAR SIR—Your proposition as to my settling Southwestern Railroad tax cases is being considered by Mr. Ely, and I think will get a consent to-morrow.

Yours, etc.,                    N. J. HAMMOND."

"ATLANTA, GEORGIA, January 22, 1877.
" *Hon. R. N. Ely, Attorney General's Office, Atlanta, Ga.:*

DEAR SIR—In 1852 the Georgia and Florida Railroad Company was incorporated with authority " at any time to incorporate their stock with the stock of any other company on such terms as may be virtually agreed upon by such companies." In 1856 the Southwestern Railroad Company agreed to purchase said company's road from Americus to Albany at $400,000, payable in stock of the Southwestern Railroad Company at par. The first payment was made in 1856, and the last in 1858. This purchase was consummated under act of 1859. See acts of 1859, pages 229, 230. The actual cost of the road and extras was $435,800. During last summer I proposed to General Lawton to settle the case of the State *vs.* The Southwestern Railroad Company, in which the Supreme Court of the United States had granted a new trial, because it was not taxable *ad valorem* for tax of 1874, and the one for tax of 1875 pending, and to abide result of former, by paying tax for each year *ad valorem* for 1874 and 1875 on the purchase part, which is taxable *ad valorem*, by putting its value at $435,000. Pending these negotiations, I received, on the last day of my official term, a proposal for payment of tax at estimated value of $400,000 from Americus to Albany, for the two years that executions were issued, 1875 and 1874. Because I was out of office, I so advised General Lawton, saying I would accept had I then authority. He has authorized me to make the same proposal to you. If you accept, I will get the $4,000 at once and pay in settlement. I don't think you could make more by trial. You might not make so much. Indeed, General Lawton says it would not now be given in as worth so much. To accept settles those cases, and fixes that property for taxation *in futuro.* What shall I do?

Yours,                    N. J. HAMMOND."

" JANUARY 31, 1877.
*"Hon. N. J. Hammond, Atlanta:*

DEAR SIR—I am instructed by his excellency, the Governor, to say, in reply to yours of the 22d inst., that inasmuch as you had virtually made a settlement with Gen. A. R. Lawton, representing the Central

Railroad, before retiring from the office of attorney general, of the tax due by the Southwestern Railroad, extending from Americus to Albany, and as no reason occurs why the same is not a good and favorable settlement for the state, that you be authorized to conclude the same on the terms mentioned.

Very respectfully, your obedient servant,

R. N. ELY, *Attorney General.*"

"ATLANTA, GEORGIA, January 30, 1877.
"*General A. R. Lawton, Savannah, Ga.:*

DEAR SIR—After considering, Mr. Ely agrees to accept your proposition to settle the Southwestern Railroad tax cases for 1874 and 1875 at basis of $4,000. Send me the money. I will pay and take proper receipt for you. I suppose you must pay costs also, and $10 would cover unpaid costs.          Yours,          N. J. HAMMOND, A. W. H. & SON."

" SAVANNAH, GEORGIA, February 5th, 1877.
" *N. J. Hammond, Esq., Atlanta, Ga.:*

DEAR SIR—Mr. Cunningham has handed me your letter to him of the 3d inst. I now hand you herein a check for $4,010 to cover tax and balance of costs on the fragment of railroad from any deduction for tax paid on income, such a receipt as will be a voucher for the cashier.          Yours truly,          A. R. LAWTON."

"ATLANTA, GEORGIA, February 8, 1877.
"*Hon. A. R. Lawton, Savannah, Ga.:*

DEAR SIR—Enclosed I hand you receipt for $4,000 paid by me in settlement of the Southwestern Railroad tax *fi. fas.* of 1874 and 1875. I have asked the clerk for his receipt for costs, which will be sent you. You paid the costs in the first. I send you my check on John H. James for balance, $7.

Cash received of you for above purposes, . .     $4,010 00
Paid attorney general for *fi. fa.* settled,   . : . . . . . $4,000 00
Paid Clerk for cost,   . . . . . . . : . . . . .        3 00
Balance in my check *supra*,   . . . . . . . . . .        7 00
                                                        ─────────
                                                        $4,010 00

I remain yours, etc.,

N. J. HAMMOND."

In pursuance of the agreement of the attorneys set forth in these letters, Attorney General Ely, on the 7th of February, 1877, receipted the company for the sum named, $4,000.00, setting forth in the receipt that the payment was in full settlement of the *fi. fas.*, that the same were to be so entered on payment of cost, and made an indorsement signed by him to this effect on the *fi. fas.* The cost $3.00,

was paid to the clerk of Fulton superior court and receipted for by him. The clerk then placed the *fi. fas.* with other settled and disposed of cases, where they remained from the 8th day of February, 1877, to the 5th day of May, 1880.. In the meantime, and on the 10th of February, 1877, the attorney general paid $3,500 of the money into the treas-- ury, and on the certificate of the treasurer to that effect, the comptroller general receipted .him for that sum, for taxes collected on the *fi. fas.*, and the cases were stricken from the comptroller general's docket. On the 6th of May,. .1880, the attorney general moved the court to open this. settlement, made by him through Colonel Hammond, with General Lawton, the company's attorney, and for leave to proceed with the *fi. fas.* on the ground that the settlement. was made without authority and under a mistake. The court on demurrer overruled the motion. This court re- versed its judgment and held that the mistake could be- corrected at any time before record and before it was made the judgment of the court. 66 *Ga.*, 403. The case then. went back to Fulton superior court for trial, and the com- pany, by its counsel, for cause against the granting of the petition, set forth that the settlement was made by the- attorney general, with the consent of the governor, that it. was a full and complete settlement of all liability on the- part of the company for all *ad valorem* taxes due.by it for the years 1874 and 1875, and that the comptroller general, who is the head of this department, having jurisdiction over the subject, was in full possession of all the facts in relation to the matter, and that he ratified and approved it. This is one of the main questions in the case.

2. The negotiations between Attorneys General Ham- mond and Ely and General Lawton amounted to nothing more than the valuation by them, of that portion of the road lying between Americus and Albany, conceded .to be subject to the *ad valorem* tax, and an agreement to pay the tax thereon. No other portion of the road, or branch thereof, was in the mind of either of them at any time.

during the progress of the correspondence, nor mentioned in any part of it. Colonel Hammond did not know of the act of 1859, under which the Georgia and Florida Railroad was purchased by the company, and by reason of which this part of the road was subject to the tax, until after the first case, made on these *fi. fas.*, had been taken to the Supreme Court of the United States, say in 1876, nor did he know of the existence of the Arlington branch until it was held subject to the tax by this court in 64 *Ga.*, 797. Attorney General Ely began his investigation of this matter in 1877, and became convinced that the Arlington and Eufaula branches were subject to the tax for these years, from some " favorable decisions " of this court in 1879. The subject-matter of the agreement was the old Georgia and Florida Railroad, a section of the company's road, thirty-six and a half miles long, which cost $435,800.00. It required fifteen letters, in nearly every one of which this section of the road alone was mentioned, to reach the conclusion. By no possible construction can these letters embrace any other subject-matter than the Georgia and Florida Railroad, known and mentioned as the Americus branch. Yet, it is contended by counsel for the company that this agreement of their attorney with the attorney general is not only binding on the state, but that its effect is to release the company from the *ad valorem* ta x on the Arlington and Eufaula branches of the road, as well as to release it from further taxation on the Americus and Albany section for those years. If such were its effect, then no one can doubt that there was a mistake in making it, and such a mistake as was clearly subject to correction. Delaware Div. Canal Company *vs.* Commonwealth, 50 Penn. St. 408.

The position of counsel for the company requires us to say, were we to sustain it, that this agreement, so plain and unmistakable as to its subject-matter, embraces not only the old Georgia and Florida Railroad, known as that section of the road between Americus and Albany, but this

road and two other distinct branches, built under different charters or amended charters, and at different times; *i. e.:*

The Georgia and Florida Railroad, built in 1856-7, 36½
    miles long, at a cost of . . . . . . . . . . . $435,800.00
The Arlington branch built in ———, 35½ miles long,
    at a cost of . . . . . . . . . . . . . . . 460,000.00 .
The Eufaula branch, built in 1859, 23½ miles long, at a
    cost of . . . . . . . . . . . . . . . . 500,000.00
_____
Three roads aggregating 95½ miles of road, at a cost of $1,395,800.00·
Instead of one road 36½ miles long at a cost of . . . . 435,800.00·

The attorney general and General Lawton, the attorney of the company, did not attempt in their correspondence to compromise a debt due the state at less than the rate of taxation or the amount due on the value of the property ; nor did they attempt to release the company by what. was done by them from the *ad valorem* tax charged by the act of 1874 on the Arlington and Eufaula branches of the road. Had they done so, the attorney general had no power to make any such contract of compromise, or to release the company from any portion of the *ad valorem* tax. imposed by the act on the property of the company. There is no law of this state that confers on him any such authority. The governor had no such power. He can only "suspend the collection of taxes, or some part thereof, until. the meeting of the next general assembly, and he cannot otherwise interfere with the collection thereof." Code, 75.

3. The comptroller general is authorized by the act of 1874, in the absence of a legal return by the company, or on failure to pay the tax assessed against its property, "to enforce the collection of the same in the manner provided by law for the enforcement of taxes against other incorporated companies," required by law to make returns to the comptroller general; that is to say, if this company fails to make its returns or to pay the taxes for which it is liable the comptroller general is required to assess the tax, in his discretion, and when there is no return by which to assess it he must do so from the best information he can

procure, and issue execution against the company for the amount of taxes due according to law, together with the cost and penalties. Code, §§876, 881.

The executions were already issued. The decision of the Supreme Court of the United States, in 92 U. S., made in 1876, relieved two-thirds or more of the company's road and property from the *ad valorem* tax, and the company ought then to have made a new or revised return. Having failed to do so, the comptroller general was authorized to correct the original returns and to assess that portion of the road and property subject to the tax, from the best information he could procure, and order the *fi. fas.* to proceed for so much of the tax as was then due and unpaid. Had he done so, it would have been the act of the state. Has he done so, either expressly or by any act of his ratifying any assessment of any part of said property made by any other person? It is not pretended that he has made any express assessment. But it is claimed that the attorney general, by the agreement made with the company's attorney, hereinbefore set forth, assessed the company's property subject to the tax, and that the company settled with him in full for all tax due the state, and that the comptroller general approved and ratified said settlement, and that the state is bound thereby.

What is the law of the case? " When the fact of agency is to be proved by the subsequent ratification and adoption of the act by the principal, there must be evidence of previous knowledge on the part of the principal of all the material facts. " *Hardeman & H. vs. Ford, 12 Ga.,* 205. If the material facts be either suppressed or unknown, the ratification is invalid. Orrings vs. Hall, 9 Peters, 608. Keeping this rule of law in view, and without deciding whether the comptroller general could under any circumstances delegate the power conferred on him by the law, or ratify in an informal way the act of another in such a matter, let us see what the facts are.

W. L. Goldsmith was comptroller general in 1874-5.

His testimony was taken by interrogatories in this case. Yet, strange to say, no information was sought or given by him as to his knowledge in relation to this alleged settlement. He does not say a word on the subject. On the 10th of February, 1877, the treasurer addressed the following certificate to the comptroller general:

"TREASURY OF GEORGIA, ATLANTA, GA., Feb. 10, 1877.

"This is to certify that R. N. Ely, attorney general, has paid into the treasury the sum of thirty-five hundred dollars, tax collected on *fi. fas. vs.* Southwestern Railroad 1874 and 1875, for which you are authorized to give a receipt.          J. W. RENFROE, *Treasurer.*"

The comptroller general receipted Mr. Ely as follows:

"FEBRUARY 10, 1877.

"Received of R. N. Ely, attorney general, $3,500, tax collected on *fi. fas. vs.* Southwestern Railroad 1874 and 1875."

The comptroller general was only authorized by the treasurer to receipt for and only receipted for $3,500.00, so far as these papers show. The only information he got from the treasurer's certificate was that $3,500.00 tax had been collected on these *fi. fas.* and paid into the treasury. The cases were stricken from the comptroller's docket by cross lines drawn across the statement of the cases thereon, and the letters " pd. " appeared opposite one of the cases. When, by whom, and under what circumstances these lines were drawn and letters made, does not appear.

The comptroller general received the return of the company for the Americus and Albany branch for the years 1876 and 1877, at a valuation of $400,000.00 for this section of the road. And from this an inference is drawn by counsel, that he had knowledge of the settlement. These returns prove no more than they contain. Beyond the fact that the sum is the same as that agreed on by the attorney general, through Colonel Hammond and the company's attorney, as their valuation of this section of the road, there is nothing in it to indicate that any attempted settlement had been made in discharge of the company's liability for all taxes for the years 1874 and 1875.

It does not appear that the comptroller general was in possession of any other facts in relation to this matter than those already mentioned, nor does it appear, as claimed in the company's affidavit of illegality, that, "with a full knowledge of all the facts and effect of said settlement, he ratified and approved" the same.

We cannot see that the position of counsel for the company is at all strengthened by the provision of the act of 1874, that the comptroller general shall be represented in court by the attorney general. This provision only authorizes the attorney general to conduct the suit or litigation, and does not delegate to him any of the duties imposed by law on the comptroller general. See 66 *Ga.*, 403.

4. The *fi. fas.* with the entries on them, were placed among the settled papers of Fulton superior court, and were there when the petition to open the settlement and proceed with them in this case was filed. We think this petition was a proper remedy. It was, in effect, a motion to vacate an unauthorized entry of satisfaction on the *fi. fas.* The cases were regularly in court. They began there, went through this court, on demurrer to the illegalities, to the Supreme Court of the United States, and back on a reversal of the judgment of this court, with direction to this court to reverse the order of the superior court sustaining the demurrer. 54 *Ga.*, 403; 92 U. S., 677. This reinstated those cases, and they stood for trial in Fulton superior court. From the attorney general's entry on the *fi. fas.*, they appeared to be settled, when in fact they never had been settled, and it was competent for the court on petition to strike the entries and to order the *fi. fas.* to proceed. But we do not think this a material question. The state might have ignored these entries and ordered the *fi. fas.* to proceed without application to the court. In such a case it would have been met with the same remedy and defence, in the same jurisdiction as that filed in this case.

5. A good deal of stress was laid by counsel for the company on the charge of the court, as set forth in the

18th and 19th subdivisions of the 15th ground of the motion for a new trial, relating to the power of the jury to assess the property for taxation, counsel for the company claiming that the jury were only authorized to determine the isolated question of the company's liability to pay the tax, and that the power to assess the property is vested alone in the comptroller general, with an appeal to assessors in cases of disputed values, as provided by Code, §§826, 832, 881, 876, 839, 840.

These cases were in court for trial on all the issues made by the pleadings or involved therein. One ground of illegality was an alleged payment of $4,000 in full satisfaction of the *fi. fas.* Another ground was the value of the Arlington branch, alleged to be only $120,000, and the value of the Eufaula branch, alleged to be only $270,000, and the defendant made a conditional tender of $600 tax on the Arlington branch, and of $1,350 on the Eufaula branch. To have restricted the jury to the position of counsel, would have excluded these grounds from their consideration. The condition of the illegality bonds requires the company to pay the *fi. fas.*, if held liable thereon by the courts. How could the court enforce these bonds, in case of default, if it was not authorized to find the amount due on the *fi. fas.* How can the amount be ascertained without a valuation of so much of the property as is subject to the tax; and who is to find the value, the court or the jury? Certainly the jury, under the charge of the court. The remedy provided by the act of 1874 is an affidavit of illegality, to be tried as other illegalities. The liability of the defendant to the tax is to be determined under its provisions, and the defendant is authorized by the terms of the act, or compliance with its conditions, "to resist the collection of the tax therein provided for." It is not only the mere "liability" of the defendant that is made subject to contest, but the "collection" of the taxes also. It is not the policy of the law to subject the determination of any case, by piecemeal, to two separate jurisdictions.

· The argument of learned counsel for the company, that a jury can only assess the tax in equity cases, where the rule requires the complainant to do equity by an offer to pay whatever may be due, is shorn of its strength by the pleadings in this case, for they embrace just such a tender as we have already seen.

The company made no separate return of those portions of the road subject to the tax, and if sections 839 and 840 of the Code apply to returns made to the comptroller general, then there was no return at an under-valuation, and nothing therefore for revision or correction.   Assessments of corporate property, for taxes accruing after the passage of the acts of the 22d of February, 1877, and the act of 1878 amendatory thereof, Code, §§826(d), 833(a), are subject to the provisions of these acts.   But these cases being only a continuation of a litigation, begun before the passage of these acts, are not even subject to the objections set forth in the dissenting opinion of Warner, Chief Justice, in *Goldsmith, comptroller general, vs. The S. W. R. R. Company*, 62 *Ga.*, 501.

6. The language used by the court in submitting the theories of counsel as to the rule which should govern the jury in valuing the road, as follows : " Now, there are these two propositions that are before you, one of the state claiming taxes, and one of a road that is trying to keep from paying the taxes", while it may have been an inappropriate form of expression, when taken in connection with the balance of the charge on this subject, the jury could not have misunderstood the court as to the questions which were submitted to them and to which this sentence referred.   Two theories are set forth in this paragraph of the charge, one being the rule as claimed by the state, and the other rule as claimed by the defendant.   The state claimed that in fixing the value of the section and branches of the road subject to the tax, the jury should value the same in connection with and as a part of the whole road according to the value of the whole line, estimating the value thereof accord-

ing to the number of miles, by the *pro rata* value of a single mile. The company contended that the section and branches should be valued at their separate, intrinsic, isolated values apart from any connection with the main road. The court submitted with these theories the reasons given, in brief, by counsel why their respective theories ought to prevail, and left it to the jury to say which theory they would adopt. There is no pretence that the position of either party was incorrectly stated; nor did counsel suggest to the court that these words were likely to mislead the jury. The jury, it seems, adopted the theory of the state. This rule, taken in connection with the balance of the charge, is more favorable than that referred to and recognized in the railroad tax cases, 92 U. S., 605, which is, where railroad companies are solvent, that the market value of a railroad is the value of its stock, plus the value of its bonds. The stock of railroad companies of recent years has been subject to great fluctuations in value. It has been a fruitful source of speculation, and very frequently the value of its stock and bonds will not afford a safe rule as to the market value of the road. Any rule, as the Supreme Court of the United States said in the cases referred to, is more or less uncertain and unsatisfactory. No one given rule can, with legal certainty, be adopted, and for this reason many of the requests to charge the jury, made by the company's counsel, are objectionable, and were properly refused. The market value of the section, which was a part of the main line, and of two branches, which fed the main line and drew to it freights for a long haul within an area of fifty miles or more adjacent to them, and which but for them might have taken another line, were to be ascertained. The rule or rules submitted to the jury should let in all the evidence and every view of the subject that would shed light upon it, such as the value of the whole line, the separate value of the section and branches, the length of each, the cost of each, the cost of reproducing the whole line or any part thereof, the market value of the whole

and of each part thereof, the market value of its stock and bonds, the net income of the road and of the stock, and the proportion which the business done on the section and branches in controversy bears to that done on the whole line. 92 U. S., 575; 64 *Ga.*, 800. Unpublished case before cited.

Any evidence that would in any way aid the jury in ascertaining the market value of those portions of the road subject to the tax should be admitted, and the property should be fairly assessed as the property of private citizens of the state at its true market value. All the evidence offered by either party in this case was admitted; none was excluded. The evidence took a wide range, extending beyond actual facts, to the opinions of several expert witnesses sworn on the trial. The court, in addition to the two theories of counsel, charged the jury, "You are to assess the unpaid taxes upon these *fi. fas.*, for which the road is legally liable to the state. The claim in this case upon the part of the state is for the taxes due upon the property from Americus to Albany, from Albany to Arlington, from Cuthbert to Eufaula; now you are to assess the value of these particular portions of the road, and after you have ascertained their value from the evidence in 1874 and 1875, then you are to assess one-half of one per cent. upon the valuation that you make in 1874 and such valuation as you may make in 1875. You are to do, under this evidence and the law I have given you in charge, what, if it were not for this issue, the comptroller general would do, under the forms of law. So you must exercise your best judgment, under the evidence and the law, and say what you find the valuation of this property to be." Judge Lyon read from a Supreme Court report, and the court continued, "All the evidence, gentlemen, is before you; you are to get at the valuation of this property from all the evidence before you. You are to look to all the evidence. I am merely stating to you the theory of the state upon the one hand and of the defendant on the other. You are to look to all

the evidence ; and from all the evidence you are to come to your conclusion as to what this property ought to be assessed at by the state, the valuation that it had in 1874 and 1875."

7. Was the verdict contrary to the evidence?

The jury found 93 miles of the road subject to the tax (there was really 95½ miles subject), and the value of the 93 miles to be $1,674,000.00, thus finding the average value per mile to be $18,000. Keeping in view the rules and elements of value before stated, let us see what the facts are. Mr. Powers values the whole line at $5,000,000.

The section from Americus to Albany cost . . . . . . . $435,800
The Arlington branch cost . . . . . . . . . . . 460,000
The Eufaula branch cost . . . . . . . . . . . . 500,000

Total cost . . . . . . . . . . . . . . . . $1,395,800

This is the original cost, and makes no allowance for subsequent improvements which increase the value of these sections of the road. The whole road is under a perpetual lease to the Central Railroad and Banking Company, with a guaranteed dividend of 7% on the stock, which in round numbers is $5,000,000. This is the annual rental of the road. At the time this lease was made, June 24th, 1869, the bonded indebtedness of the road was $700,000. The Central Railroad Company, in addition to its guarantee on the stock, agreed to pay the principal and interest of this bonded indebtedness. These bonds were plain bonds, convertible into stock. There were $3,500,000 of tripartite bonds issued after the merger of this road with the Central, and the $700,000 of Southwestern bonds were taken up with part of these tripartite bonds. Now, estimating the guaranteed stock and the $700,000 of original Southwestern bonds at par, according to the rule in 92 U. S., 605, we have the value of the whole line and branches, $5,700,000. The length of the whole line is 307 miles, so this makes the average value over $18,000 per mile. If the income on thi stock and bonds, $399,000, rating it at 7%, is capitalized on a basis 6% for money, it would greatly increase

this value per mile. It must also be remembered that the dividends can never be less than 7%, and will be increased. if the Central Railroad earns 10% in the ratio of 8 to 10, and that a stock dividend has been paid to the Southwestern Railroad Company of $32 a share.

The true rule of valuation in this case seems to us to be, to estimate the road and branches as a whole. Nelson Tift says: " I would estimate all the parts as one road, their extensions, branches, side tracks, etc. All the parts are necessary to the financial success and value of the road, and are all representatives in the value of the stock." The road from Macon to Eufaula which embraces a part of the old Georgia and Florida Railroad, and the Eufaula branch, is operated as a main line. How can you estimate the value of any part of this portion of the main line, except as a part of the whole; and how can you value this part of the main line without estimating with it that portion of the road to Columbus? It cannot well be done, nor can the branches which feed the main lines be correctly valued except as a part of the whole. Mr. Raoul was unable to apportion the earnings between the main line and the branches, though pressed to do so by counsel for the state. There is no separate rolling stock for the branches. The value of the road and branches, of the rolling stock, and of the income, must all be considered in their entirety; they cannot be apportioned with any reasonable certainty. The verdict of the jury is supported by the evidence. We do not, however, intend to fix the rule adopted by the jury as an absolute rule for the future assessment of this property. It must be assessed at all times, as the property of other people, at its actual market value; and future returns are subject, as we have said, to Code, 826(d) and 833(a). See also 62 *Ga.*, 501.

8. We think the court was right in requiring the interest to be written off the verdict. Taxes are not debts in the sense in which that word is ordinarily used. Code, 2056, embraces all liquidated demands arising in contract, either express or implied, or otherwise, where the sum to be paid

is fixed or certain. We do not understand that taxes are ordinarily embraced in the term "liquidated demands." Open accounts did not bear interest until subjected thereto by the act of 1858.

In the third paragraph of section 2533, Code, taxes are mentioned in connection with "other debts," as entitled to priority of payment out of the assets of a decedent's estate. But this does not prove that they are debts in the ordinary sense of that term. Section 2571, which provides that the year's support of a decedent's family shall "be preferred before all other debts," is similar in its verbiage to that above quoted. Yet, it is plain that, notwithstanding it is thus connected with the term "other debts," it is not a debt. This court has so decided in *Barron vs. Burney*, 38 *Ga.*, 264.

Taxes are not ordinary debts; they are not contracts, either express or implied. They cannot be collected by suit at law in the absence of express statutory provision; they are not the subject-matter of set-off. 7 Ab. Pr., 248; 7 La. An., 192; 1 La. An., 436; 8 Met., 393; Quincy Mass., 58; 3 Met., 520; Lane *vs.* Oregon, 7 Wall., 80; Packard *vs.* Tisdale, 50 Maine, 376.

In Savings Bank vs. United States, 19 Wall., 227, an action of debt for the recovery of an internal revenue tax, due by that bank, was sustained on general principles, but more particularly on the express provisions of the statute. Mr. Justice Bradley and Field dissenting on the ground that the action would not lie for the recovery of a tax of the kind, until it had been first entered on the assessment roll. No reference whatever was made to the case in 7 Wall., 80, before cited. The jury found a special verdict, embracing the principal sum, and $1,100.00 as interest, if the court should be of opinion the plaintiff, under the law, was entitled to recover it. The circuit court gave no interest, because the bank was not reprehensibly in default, and because its refusal to pay the tax was induced by the inconsistent action and the conflicting opinions of the de-

partment. See page 231 and note. The question of interest was not raised in the Supreme Court, and none was allowed, notwithstanding several years had elapsed after the tax became due.

In the case of Delaware Division Canal Company vs. Commonwealth, 50 Penn. St., 409, interest was allowed; but this was by reason of the act of 1811, which provided that "all balances due the commonwealth on accounts settled agreeably to this act shall bear interest from three months after date of settlement until paid." See page 405.

In the City of Dubuque vs. Illinois Central Railroad Company, 39 Iowa, 56, an important case argued by quite a number of attorneys representing this and other companies interested in the decision, the main question decided was, that the general assembly had no power to release the railroad company from the payment of taxes levied by the city for the year 1871, by subsequent legislation. Beck, J., held that the tax was a debt, and that there was an implied contract on the part of the defendant to pay it, which the general assembly could not impair. The other members of the court placed their opinions on constitutional grounds. Beck, J., also held that an action at law was maintainable for the recovery of taxes under special circumstances, but not in ordinary cases; but this ruling was not concurred in by the other three judges. Cole, J., expressly dissented from it, upon the ground that the tax was not a " debt which could be recovered by an action at law. " The court, citing the authorities, said some of them "hold that taxes do not bear interest unless it is so prescribed by statute. " See pages 75, 76, 72, 90, 53. The question of interest was not decided further in this case.

" The assessment of taxes does not create a debt that can be enforced by suit, or upon which a promise to pay interest can be implied. It is a proceeding in invitum, " not founded upon contracts, express or implied. Shaw vs. Picket, 26 Ver., 482. " A debt universally bears interest

from the time it is due. A tax never carries interest. No instance, it is believed, can be found since the formation of the government where a claim for interest on taxes has been made or enforced. " The City of Camden *vs.* Allen, 2 Dutcher, 399 ; Perry *vs.* Washburn, 20 Cal., 318, 350. It has not been customary to collect interest on ordinary tax *fi. fas.* in this state. These *fi. fas.* stand on the same footing with those against the people of the state for their taxes. Our system for enforcing the payment of taxes is one of penalties and not interest. See Code, 826(g), 854, 876 to 880, 910. In the latter section it is expressly provided that the penalty shall include interest. In the absence of statutory provision, taxes do not ordinarily bear interest. Where the circumstances raise an implied contract, or where there is an express contract to pay, the rule would be different, such as defaulters having in their hands public moneys, persons at whose instance or for whose benefit tax *fi. fas.* have been taken up and docketed on the execution docket, under Code, §891(a), and in cases of vexatious or unfounded litigation against the rights of the state.

In Bank *vs.* Commonwealth, 10 Penn. St., 453, it is said, "Where the fact of non-payment is ascribable to mutual misapprehension, or to the *laches* of the creditor, interest is not demandable as of course. The detention must smack of injustice to make the debtor liable. " And in 64 *Ga.*, 800, this court suggested, but did not decide, that the payment of interest from the time the tax was claimed by the officers of the state might depend on the question as to " whose fault caused the delay. " The state claims the company was first at fault, and that it owes interest from the end of the years 1874 and 1875. The state issued these *fi. fas.* for the taxes of these years, for over $28,000 for each year, based upon the value of the whole property of the company. The defense was successful in the Supreme Court of the United States in 1876, and after a protracted litigation, over two-thirds of the company's property was found to be exempt from the *ad valorem* tax. On the 6th

of May, 1880, the state again moved, on the petition filed in this case, on these same *fi. fas.*, without the entry of any credits thereon.   One ground of illegality is that the tax on the defendant's wild lands, returned at $9,990.50; on 6,417 shares of stock in other railroads, most of which is worthless, returned at $311,700.00, on some of its bonds returned at $69,000, (stated in 62 *Ga.*, 497, $6,900); on its steamboat stock, returned at $24,719; on its notes, returned at $11,250,—amounting in the aggregate to $426,659.50, was, on the 19th of April, 1880, before this case was renewed, paid by the Central Railroad Company for the Southwestern, and this was admitted by the state on trial of this case. The failure of the state to credit the *fi. fas.*, so as to release that portion of the road exempt under its original charter from the *ad valorem* tax, and so as to release the above stated property from the lien of the *fi. fas.*, rendered this part of the defense necessary.   The *fi. fas.* were proceeding for too much.   In these respects the state was at. fault. The act of 1874 only seeks to tax the property of railroads as the property of other citizens is taxed, and the remedy therein provided was allowed for the purpose of settling fairly and legally the liability of the roads to the tax.   The company, in joining issue with the state, did nothing more than it was invited by the state to do.   Besides this, the jury found interest for six years on the tax of 1874, and for five years on that of 1875, when the tax was not claimed in this case until the 6th of May, 1880, this being the time when the petition to re-open the *fi. fas.* was filed; and in this case no separate assessment was made, until it was done by the jury on the trial of the case.   See, also, 18 *Ga.*, 177; 2 Kelly, 376; Code, §812.   Of course, the taxes found to be due in this case bear interest from the date of the verdict.

9. Counsel for the company claim credit for a *pro rata* part of the income tax paid in 1874–5, and stated in the argument the payment of it was admitted by the state.   The record is indefinite in this respect.   If the tax was paid, it is proper that the court below should direct that a *pro rata* part of

the principal sum so paid be credited on the amount due by the company, and we so direct.

10. To the first and second grounds of the motion: an entry of satisfaction on a *fi. fa.* by the attorney of record, is *prima facie* valid and binding on the plaintiff. In this case the entry indicated a " settlement, " not a full satisfaction of the *fi. fas.* The documentary evidence and the company's returns, introduced by the state, were sufficient under the pleadings, and in view of the legal question raised thereby, to support the ruling of the court.

The reference in the charge to the Perry branch did no harm. The jury were told it was not in the case, and they did not embrace it in their verdict.

The third and fourth grounds assume that the state was legally a party to the alleged settlement. The eleventh ground of the motion excluded from the consideration of the jury the question of mistake, and was not authorized by the evidence. As we have seen, the comptroller general only receipted for $3,500 tax collected on the *fi. fas.*

The state was reasonably diligent in proceeding with these *fi. fas.*, under all the facts of this case.

The remaining grounds of the motion are covered by the opinion.

11. In the case of the State *vs.* The Southwestern Railroad Company, the judgment is reversed, with directions to the court below to pass an order remitting the interest only, and with these modifications allowing the verdict and judgment to stand as rendered, the railroad company to pay the cost of its own bill of exceptions, and the state to pay the cost of its bill of exceptions.

The case of the Southwestern Railroad Company *vs.* The State is affirmed.