WRIGHT, comptroller-general, *et al. vs.* THE SOUTHWESTERN RAILROAD COMPANY.

1. Where any ministerial officer of the state is attempting to collect money out of a person, natural or artificial, under the forms of law, but without any valid constitutional law to authorize the process he uses and calls an execution for taxes, it is the duty of the courts, on a proper case made, to arrest the proceeding in some of the modes known to the law, and afford relief to the party complaining.

2. Equity has jurisdiction to interfere in behalf of the railroad company on the following grounds: first, because exactions are pressed upon it, in the form of annual taxes, inconsistent with and violative of its chartered rights, and destructive of its franchise; secondly, because the exactions might be repeated if these are successful, and suits and costs be multiplied; thirdly, because it was misled by the action of the comptroller and a legal fraud perpetrated upon it; fourthly, because of mistake caused by the defendant's conduct ; and fifthly, because the numerous questions made as to different parts of the road, and the liability of each portion or branch, most of them dependent for adjudication on separate charters and amendments, and other questions in respect to other items of property in and out of this state, and in what degree or how connected with this road, and whether liable or not to be taxed, make the case complicated to a degree that a court of equity can better unravel it than a court of law.

3. Tax executions having been issued against the railroad and levied upon property in Bibb county, by the sheriff thereof, and the principal office of the road being in that county, the superior court thereof had jurisdiction of a bill to enjoin the collection of the *fi. fas.* That another railroad, the principal office of which was elsewhere, had leased that road and agreed to pay its taxes, would not alter the case.

4. Under the facts of the case, it is apparent that to collect the tax upon the entire property of the railroad, without regard to the limitations of its charter, would be unconstitutional, and the chancellor was right to enjoin further proceedings until the final hearing of the case.

(*a*). The status of the various parts of the road as to taxation defined.

5. Whilst the words in limiting the taxing power of the state are very broad in the original charter of 1845, the limitation covering the said railway and its appurtenances and all property therewith connected, yet, under the rules for the construction of such grants, they will not be construed to embrace real estate other than that the continuous use of which is necessary for the road—that is, that lying each side of its track, and that covered by its depots, yards and shops and other places necessary to the full exercise of its franchise.

(*a*). Stock in the company's own road held by itself, or in other roads in this state, whose charters limit or exempt taxation thereon, and whose income is taxed, is not liable; and stock held by the company in railroads without the limits of this state is not taxable here.

(*b*). Bonds, notes, or other mere evidences of debt, unless they form part of the income of the road, are subject to the ordinary rates of taxation. So, also, water-craft belonging to the company in 1876 and 1877:

6. The company has acted in good faith, has offered to do equity, was misled by the officer of the state, and has not lost its rights by its own laches; therefore this is not a case to warrant the enforcement of penalties for default.

7. As the company owes the state tax on part of its property, not covered by the limitations in its charter, it would seem equitable that it should pay interest at least from the time the tax was claimed by the officers of the state.

Injunction. Tax. Constitutional law. Railroads. Laws. Stock. Before Judge SIMMONS. Bibb County. At Chambers. December 22nd, 1879.

Reported in the decision.

R. N. ELY, attorney-general; R. TOOMBS, for plaintiffs in error.

A. R. LAWTON; LYON & GRESHAM, for defendant.

JACKSON, Justice.

The Southwestern Railroad Company brought their bill in equity against Wright, the comptroller-general of the state, and Cherry, the sheriff of Bibb county, to restrain them from the collection of certain *fi. fas.* for taxes, purporting to be legally due the state for the years 1876 and 1877, but alleged in the bill to be unconstitutional and wholly illegal and void. The chancellor granted the injunction, and the defendants excepted.

The executions are each for some twenty odd thousand dollars, and for penalties for failure to return and pay taxes each in three times the amount of the tax alleged to be due, the exact amount being for the year 1876 $26,642.29-100

and for penalty $79,926,30-100, and for the year 1877 $28,-203,29-100, and for penalty $84,609,87-100.

They were issued by the comptroller-general on the 3d of December, 1877, on assessments made by him of the value of all the property of the company, based upon returns of the company for the years, and made in the years, 1874 and 1875. The tax is on the entire road-bed, bridges, iron, locomotives—everything belonging to the railroad company as contained in the returns and valuations made in 1874 and 1875, and for three times that sum for penalty ; in the aggregate, over two hundred thousand dollars. The tax is at the same rate per cent. *ad valorem* as the property of all the people of the state is taxed, without regard to any limitation thereon in the charter of the company, and the executions are levied on the depot and other railroad property of the company in the city of Macon and county of Bibb. To these tax executions the company filed affidavits of illegality under the act of 1874, renewed in 1875, and in 1876, which provided that on certain conditions precedent being complied with, these affidavits of illegality might be taken, returned to the superior court of Fulton county, and appealed by bill of exceptions to this court. This was attempted to be done, but no full and complete returns having been made as contemplated by the act of 1874 as one of the conditions precedent, this court dismissed the illegalities. See pamphlet report, February 9th, 1879, p. 74.

In the opinion or syllabus thereof so ordering the affidavits of illegality to be dismissed, the court intimates that owing to the apparent intricacies and complications of the case of this company, its more appropriate and complete remedy would be in equity. So we have now before us this bill in equity seeking to restrain the sheriff of Bibb county and the comptroller-general from further prosecuting the executions and levies alleged to be wholly unconstitutional and void.

It is substantially alleged in the bill that complainant

failed to make the full returns required by the act of 1874, in order to have the affidavits of illegality tried, because it was misled by the action and conduct of the comptroller-general himself—that tax executions, like these for 1876 and 1877 now being pressed against the company, were issued for 1874 and 1875, and the questions of their validity were tested before the superior court of Fulton county under the act of 1874, full returns having been then made pursuant to that act; that the case was taken thence to this court, and hence to the supreme court of the United States, where it was adjudicated that the execution for 1874, just like these, was illegal and void, in that it impaired the obligation of the contract made between the state and the company in respect to taxation and set out in the company's charter—the state having therein obligated herself not to impose on the company a higher tax than one-half of one per cent. on its net income; that the comptroller-general, after this judgment of the supreme court of the United States, was of the same opinion with the complainant, that the liability of the company for taxes beyond the limit fixed in its charter was settled, and so believing sent to complainant a schedule of returns to be made by it, embracing only its gross and net income, so as to have the company taxed according to its charter; that it made its returns for 1876 and 1877 in accordance with the schedule so sent it and the instructions thus given it by the comptroller-general, and paid all the taxes required by that officer and by the law for said years 1876 and 1877, for which it has the said officer's official receipt; that things moved on smoothly in this way, complainant not dreaming that it was liable for more taxes, until the 3rd of December, 1877, when said executions for these large sums, and penalties for not making the full returns, were, to its amazement, issued by the comptroller-general and levied upon its property in Macon without notice or warning; that the comptroller-general had prior to that time, ever since the act requiring full returns to be made by it and other companies,

sent to complainant a schedule of those returns, and after this decision of the supreme court of the United States, changed that full schedule, and sent out to complainant that which it filled up and returned; that this misled complainant, and the subsequent issue of the executions taxing all its property, in connection with the conduct of the comptroller before recited, operated as a great hardship and fraud upon the complainant; that these executions would not have been issued by the comptroller-general, who absolutely refused to do so, but for the following executive order from the governor of the state:

"STATE OF GEORGIA, EXECUTIVE DEPARTMENT,
"ATLANTA, GA., December 3d, 1877.

"*Ordered*, that the comptroller-general issue execution for unpaid taxes due the state against such railroad companies as may be designated by Robert Toombs, attorney for the state, and the attorney-general.

(Signed)      "ALFRED H. COLQUITT, *Governor.*
"By the Governor:
"J. W. WARREN, *Sec. Ex. Dep't.*"

That thereupon, under the instructions of said attorneys, and in obedience to said order, they were issued, and are therefore not the act of the comptroller-general, but the act of the said counsel of the state; that all legal taxes have been paid; that the property levied on, to-wit: the offices and depot and other property in Macon, is exempt from the tax, being appurtenances to the road absolutely necessary to use the franchise granted it for the public benefit and its own chartered contract with the state, and if these taxes are enforced in the manner and to the extent threatened, its entire franchise will be destroyed and rendered worthless. Therefore the prayer is that the sheriff and the comptroller-general be restrained from further pressing the *fi. fas.* and levies made on the company's property, they being for no constitutional, legal and valid tax, but for exactions violative both of the constitution of the United States and of the state of Georgia, and illegal and void.

To this bill, thus briefly epitomized, the comptroller gen-

eral Wright, Goldsmith who issued the executions being no longer in office, replied by answer that the superior court of Bibb county as a court of chancery and the judge thereof as chancellor, had no jurisdiction of said suit, and that the same should be dismissed—that the common law remedy provided by statute, the act of 1874, was complete and failed by reason of complainant's laches—that neither complainant nor the comptroller-general, nor the sheriff had any interest in the case. Complainant had none, because the Central Railroad & Banking Company had leased its road and bargained to pay its taxes—the sheriff had none, because he was a mere executive officer, levying according to official duty, and the comptroller-general had none, being also a mere officer of the state, and that the entire thing, stripped of disguise, was an attempt to evade the prohibition against judicial interference with the collection of state taxes—the state being the real party in interest, and especially is the Bibb county superior court without jurisdiction, because no substantial relief is prayed for against any defendant resident therein—that the United States supreme court did not conclude the right of the state to tax this company for much of its property, because such property was not the railroad-track, nor iron, nor any other thing "appurtenant to the road or connected therewith," in the sense of these words as used in the charter, and that the legal taxes should be paid at any rate before the company could be heard to set up any defense to that which it alleged was illegal, and that, to say the least, much of the property was liable and the tax levied thereon was legal and constitutional, and had not been paid or offered to be paid.

1. These are substantially the issues made in this important litigation, and we have endeavored to give to them that consideration which they merit, and apply the law as we understand it to all the issues made by the pleadings. First, had the chancellor sitting for Bibb county and exercising equity powers therein, jurisdiction to grant the injunction prayed for?

The Code, section 3668, declares that " no replevin shall lie nor any judicial interference be had in any levy or distress for taxes under the provisions of this Code, but the party injured shall be left to his proper remedy in any court of law having jurisdiction thereof." This section is codified from the tax act of 1804, Cobb's Dig., page 1051, where these words are found : "And no replevin shall lie, or any judicial interference be had in any levy or distress for taxes under this law, but the party injured be left to his own proper remedy in any court of law."

The plain meaning of these words, as used in the act of 1804, is that the courts shall not interfere with the collection of taxes imposed by that law. The words are "under this law;" if not imposed "under that law," then the inference is that there may be interference by the judiciary. In other words, if that law authorize any tax, its collection by levy and distress shall not be hindered; but if that law does not authorize the tax, then it may be hindered by the courts. And so it has been ruled by this court.

In *Vanover vs. The Inferior Court et al.*, 27 *Ga.*, 355, Judge LUMPKIN, after laying down the general rule that the 21st section of the act of 1804, above quoted, does not apply to municipal corporations and counties in their levy of taxes, uses this language : " But apart from this plain and palpable view of the case, the prohibition applies only to taxes properly laid under the act of 1804, and acts amendatory thereof. But suppose, as in this case, the inferior court assumes jurisdiction to levy a tax without authority of law to do so, or the ministerial officers of the state undertake to collect a tax on property, not only not taxable, but expressly exempt from taxation, would not the courts arrest such an attempt, that not being a tax authorized by the act of 1804, or any subsequent statute amendatory thereof? Most clearly. We hope the profession and the public will apprehend this distinction, and that there will be less doubt and confusion upon this subject."

It will thus be seen that if the tax were laid upon property

not taxable, and especially if it be exempt from taxation, the courts would "most clearly," to use Chief Justice LUMPKIN's words, "arrest" such an attempt.

The same construction precisely has been given to section 3668 of the Code above cited, which indeed is but the 21st section of the act of 1804, applied to taxes laid in the Code and amendments thereof. In the case of *Barlow et al. vs. The Ordinary of Sumter County*, 47 *Ga.*, 643, Chief Justice WARNER uses this language: "Section 3618 (now 3668) of the Code declares that no replevin shall lie, nor any judicial interference be had in any levy or distress for taxes under the provisions of this Code, but the money sought to be collected in this case is not for any tax legally imposed under any provision of this Code, or any other Code, which in law would bind the people of Sumter county to pay it, and the defendants, as securities of the tax collector, to refund it."

So that it seems clear, from these adjudications, that the construction put upon the act of 1804, and the Code on the subject of judicial interference, is that if the tax be imposed upon property not exempt, or on property upon which a tax might constitutionally and legally be laid, and if it were authorized by the constitution and laws of the state, and thus became a valid law and a tax due the state, then there could be no judicial interference; but if the act under which the ministerial officer of the state was proceeding were unconstitutional, by reason of the property being exempted by contract from taxation or otherwise, then the judiciary should interpose and arrest the collection.

So in *White vs. The State*, 51 *Ga.*, 254, Judge McCay expresses great doubt of the constitutionality of the immunity from judicial interference on the part of the state, and the court refuses to extend it.

Again, in *City of Athens vs. Long et al.*, 54 *Ga.*, 33, the same judge uses this language: " The general rule that it is not competent for the judicial department of the government to interfere with the legislative department in the ex-

ercise of the taxing power, except in cases where it is attempted to violate the *prohibitions* of the constitution, is undeniable." Thus it seems in his judgment that the courts should arrest an unconstitutional exaction, though authorized by the legislature, if that body violated the constitution.

So also in *Decker et al. vs. McGowan*, 59 *Ga.*, 806, Judge BLECKLEY says : " It is certain that as a general rule judicial interference with the collection of state taxes, is forbidden (citing authorities). Perhaps there is not, save in instances expressly provided for by the statute, a single real exception to the rule, properly understood, the so-called exceptions being only apparent. Nothing is a tax but what has the nature of a tax, and is imposed by some law. For an officer to exact money under the name of a tax, when there is no law to warrant the exaction, is not an attempt to collect taxes, but an attempt to collect something else ; and the rule which excludes interference in the collection of taxes does not apply." And he goes on and applies this test : " Conceding all the elements of fact to be as the officer decides them to be, or as favorable to him as possible, would his action be legal or illegal? If legal, no interference ; if illegal, interference to the extent necessary for the citizen's protection."

Still on the same line of distinction, drawn by Chief Justice LUMPKIN in 27 *Ga.*, and the cases of *The Georgia Mutual Loan Association et al. vs. McGowan et al.*, and *Burke et al. vs. Speer*, in 59 *Ga.*, pages 811 and 353, follow in the same direction.

And so also does 60 *Ga.*, 505, the case of *Miller vs. Wilson*, where it is held that " in the absence of explicit language clearly expressing the will of the legislature to tax the bonds of the state, the general assembly will not be presumed to have passed upon so grave a question of public policy from the use of general words, especially when like words have been employed in former acts, and the executive department has never construed them to embrace

state bonds; therefore the tax act of 1877 empowering and authorizing 'the governor, with the assistance of the comptroller-general, to assess and levy a tax upon the taxable property of the state,' cannot be legally construed to authorize a tax upon the bonds of the state." In the same case it is said that "no point has been made upon the question of judicial interference with the collection of taxes under section 3668 of the Code; and inasmuch as the case involves no question of fact at all, but is one of pure law, this court will not itself, of its own mere motion, decline to exercise jurisdiction. Indeed it might well be doubted whether under the constitution, either of 1868 or 1877, it could decline to pass upon a question of pure law."

By reference to those constitutions it will be seen that our fundamental law declares: "Legislative acts in violation of this constitution, or the constitution of the United States, are void, and the judiciary shall so declare them." Cons. 1877, art. 1, sec. iv. par. ii; Cons. 1868, art. 1, sec. xxxii.

It is difficult to see how the judiciary is to declare an act unconstitutionally imposing a tax on the citizen void, if the citizen has no right to appeal to the courts, and the courts no power to interfere. Courts can only act on cases brought before them, and if they cannot be brought before them in some way, these words of the constitution are mere mockery.

It seems to us, therefore, clear, that where any ministerial officer of the state is attempting to collect money out of a citizen, or a person natural or artificial, under the forms of law, but without any valid constitutional law to authorize the process he uses and calls an execution for taxes, it is the duty of the courts, on a proper case made, to arrest the proceeding in some of the modes known to the law, and afford relief to the party complaining.

And the general assembly in 1874, when it began a system of more thorough investigation into the taxes paid by railroad companies, and when itself seemed doubtful of the

extent of its powers under the contract made with these companies in their charters, recognized that simple justice required some mode of testing before the courts the constitutional and legal rights of these corporations, and provided a remedy. That remedy furnished a court and the means of reaching it, wherein law and fact could be examined, and full justice be done. Therefore it cannot be said that our state has been so unjust as to empower her ministerial officers to extort money from any person entitled to her protection, without giving that person a remedy, if the officer were proceeding against the fundamental law of the state.

This company used this remedy, and tested the main question made in the record, by affidavit of illegality to a similar tax levied on its property in 1874; and it was prevented or misled by the acts of the comptroller-general in transmitting to it a different schedule or form of returns, after it had gained the case made before, from using the same remedy to test this proceeding for 1876 and 1877. It cannot be fairly said in a court of equity that it was the laches of the company that it did not comply. It certainly was not negligence unmixed with fault in the comptroller. It was misled by his official act. If it made a mistake, the mistake was caused by the change of the form of its return sent it by the comptroller-general, and surely equity will relieve against a mistake so superinduced. It is remediless now under the mode provided by the act of 1874. It has no remedy at law as the case now stands. It cannot make now the return required to have been made in 1876 and 1877, because the time has passed; and if it has any remedy it is in equity.

Besides, this court at the very time and in the very act of dismissing the case at law, because it had not complied with the conditions required by the statute, which alone gave the superior court of Fulton jurisdiction, announced that it had a remedy in equity, and from the nature of the case it was more complete than at law. The complainant

might well add to its charge of being misled by the comptroller-general, the charge of being misled by this court, if we should hold that equity could not give it any relief.

2. We hold that it had the right to relief in equity. First, because exactions are pressed upon it, in the form of annual taxes, inconsistent with and violative of its chartered rights, and destructive of its franchise ; secondly, because the exactions might be repeated if these are successful, and suits and costs be multiplied ; thirdly, because it was misled by the action of the comptroller, and a legal fraud perpetrated upon it ; fourthly, because of mistake caused by the defendant's conduct ; and fifthly, because the numerous questions made as to different parts of the road and the liability of each portion or branch, most of them dependent for adjudication on separate charters and amendments, and other questions in respect to other items of property in and out of this state, and in what degree or how connected with this road, and whether liable or not to be taxed, make the case complicated to a degree that a court of equity can better unravel it than a court of law. And more than all, because the process of injunction seems necessary to arrest what appears to be an unconstitutional exaction. Burroughs on Tax., 363, note and cases cited ; 92 U. S., 575.

3. If equity has jurisdiction, in what county shall the bill be filed ? The levy is made on property in Bibb ; the wrong, if it be a wrong, is about to be perpetrated in Bibb ; the sheriff of that county is the agent used to perpetrate that wrong ; the executions are issued against the company whose chief place of business and principal office is in Bibb ; the effort is made to collect the alleged taxes from this complainant and not from the Central Railroad & Banking Company ; and though that company be bound by contract with the complainant to pay those taxes, still that does not release the complainant, the Southwestern Railroad Company, from its higher obligation to the state to pay those taxes, if legal ; nor does it exempt the property levied on from being subject to taxes by the state if legally imposed ;

the state cannot herself be sued, and the only two ministerial officers she has, who are illegally attempting this wrong in her name, are the sheriff of Bibb and the comptroller-general of Fulton, and against these officers alone can any relief at all be had ; and the bill must needs be brought either in Fulton or in Bib·, and the levy being made on property in Bibb, and the sheriff residing there, the court of chancery there is the better entitled to the jurisdiction.

4. It thus being shown that equity has jurisdiction, and that the chancery court of Bibb county is the court which has the better right to exercise it, we are brought to the consideration of the merits of the case.

Was the chancellor right to grant the injunction ?

The tax is imposed on the entire property of the company, without regard to the restriction on taxation specified in its charter, and in the teeth of the principle decided by the supreme court of the United States, whose judgment was made the judgment of this court, and transmitted to the superior court of Fulton county for further proceedings. The principle thereby ruled covers certainly the much larger part of the property of this road as exempt from taxation, except as limited in the charter, and which has been paid for both years 1876 and 1877. Yet these heavy taxes, with these heavier penalties, are sought to be forced in the name of the state out of this company illegally and unconstitutionally by these two officers, contrary too to the spirit of the legislation of this state as shown in its desire to have the questions fairly tested by the highest courts of the country, and contrary to its own constitution and to that of the United States, and the executions are levied upon the very forehead—the marrow—of the property which is exempted by that judgment.

If equity has jurisdiction and an injunction can ever be granted in a case of this sort, where under color of tax process illegal exactions are made upon a corporate body, surely that case is before us here. Therefore we think that the chancellor did not err in applying it to these executions,

and in staying the entire proceeding until an investigation can be had fairly and fully on the final hearing, and a decree be made settling the rights and obligations of the complainants—those items of property on which it is, and those on which it is not, liable to be taxed *ad valorem.*

It admits its liability to pay nothing more than it has paid. Hence, it cannot tender any sum as due; but it offers to pay whatever may be found to be due according to law. This, we think, is a substantial compliance with the rule in equity which requires suitors in her forum to do equity, and therefore to pay what is owing before the complainant is entitled to relief in regard to what is not due.

We think too that on the hearing complete relief should be afforded, and the whole matter be investigated to ascertain precisely what property of the company should be taxed and what should not be taxed—or in other words, what has paid its tax and what has not—or what is covered by the charter and what not. And in order to facilitate the trial, or a settlement if desired before trial, we will indicate our opinion in regard to these matters now.

(*a.*) We think that the portion of the new Southwestern Railroad, known as the former Muscogee Railroad, from Columbus to Butler, is not liable to be taxed beyond the limitation fixed in its charter, it being covered by the supreme court decision.—92 U. S., 665. That the road from Fort Valley to Butler is not liable further than fixed in the charter, because the words authorizing the extension to Butler, or Wolf Pen as then called, exonerate the extension from further taxation—those words being: "That all the rights, privileges and powers whatsoever, heretofore granted to the Southwestern Railroad Company, shall extend over the railroad hereby authorized to be built." This confers on the extension every right and privilege which the Southwestern Company had, and among the most valuable of these rights and privileges is the right and privilege to be exempt from taxation beyond "one-half of one per cent. on its net annual income."

That the road from Fort Valley to Perry is not in this litigation and cannot be brought in, because the tax execution is not issued against the Southwestern Company, and that company has not, and could not, enjoin that process against another company, to-wit: the Fort Valley and Hawkinsville Company.

That the main line of road as authorized to be built extends from Macon to Fort Gaines, and is exempt from taxation except as limited in its charter, the entire line through. We construe the franchise to build the road " to some point intermediate between Albany and Fort Gaines, or to any point or points upon the Flint and Chattahoochee rivers below Albany and Fort Gaines, to be agreed upon by the company, from which point the said company may build branch railroads to Albany and Fort Gaines," contained in the original charter of 1845, in connection with the amendment of 1850, which provides " that if said company do not build the main trunk of said road to or below Fort Gaines within two years," etc., and so construing them, we think that the company was authorized to build the main trunk to Fort Gaines, and has done so, and that the line is exempt from further tax.

We think that the words used in the said amended act by which we understand the road from Cuthbert, or a point near Cuthbert, to Eufaula, was built, to-wit, " under the rules and restrictions as they are now authorized to construct said Southwestern Railroad," are not sufficient to limit the taxing power on that road—from Cuthbert to Eufaula, and that it is liable to such tax as is imposed on other property in the state *ad valorem*, of course deducting what has been already paid by the company for its proportion of the income tax.

We think that the branch from Albany to Arlington is liable to the *ad valorem* tax, with the like *pro rata* deduction for its proportion of what income tax has been paid in its behalf, because it is made expressly liable for " such additional tax as the legislature may hereafter impose." And

when a tax *ad valorem* was imposed on all the property of railroad companies not limited as to taxation in their charters, the additional imposition was laid on this branch, and the company is liable therefor, deducting of course what has been paid as its part of the net income tax of the company.

We think that by the express language used in the amendatory act of December 19th, 1859, by which the railroad known as the Georgia & Florida Railroad was consolidated with the Southwestern, it being completed from Albany to Americus, to-wit, "that the said railroad from Americus to Albany shall be considered part and parcel of the road of the Southwestern Railroad Company, and be liable to pay to the state the same tax that the rest of the Southwestern Railroad Company is liable to pay, and such additional tax as the legislature may hereafter impose," that portion of the road is liable to pay the *ad valorem* tax less its proportion of the income tax already paid ; but if it has already by agreement paid an *ad valorem* tax at a certain valuation then it is not liable to be taxed further for the years embraced in the agreement ; and we think that the law officer of the state, the attorney-general, could and did bind the state by the agreement made pending this litigation.

In the statement that the line through from Macon to Fort Gaines is not liable to be taxed, except as prescribed and limited in the charter of 1845, of course we do not include the short track from Americus to Smithville, as that was part of the Georgia and Florida road, and is covered by the reservation of the state's right to tax when the Southwestern was allowed to absorb and consolidate that road with itself.

5. Whilst the words limiting the taxing power of the state are very broad in the original charter of 1845, the limitation covering the said railway and its appurtenances, and all property therewith connected, yet, under the rules for the construction of such grants, they will not be con-

.strued to embrace real estate other than that whose con-tinuous use is necessary for the road; that is, that lying each side of its track, and that covered by its depots, yards and shops, and other places necessary to the full exercise of its franchise. 40 *Ga.*, 646, 651, 655; 34 Ver., 484; 72 Ill., 452; 52 Miss., 127. Therefore, lands off the road, and bought originally to procure cross-ties from the timber thereon, are liable to the *ad valorem* tax.

(*a.*) Stock in the company's own road, held by itself, or in other roads in this state, whose charters limit or exempt taxation thereon, and whose income is taxed, is not liable; and stock held by the company in railroads without the limits of this state is not taxable here. Stock in a railroad is really but so many shares of its property, and that prop-erty is real estate, for the most part at least, and taxable by the state in which the road is located.

(*b*). But bonds, notes, and all other mere evidences of debt, follow the *situs* of the creditor, no matter where the debtor lives. Code, §798; 50 *Ga.*, 392. So, any such evidence of debts due this corporation, whether held on natural persons or corporations, in or out of this state, are taxable. If, however, merely income, and taxed and paid as such, they ought not to be taxed again; if invested, they should be taxed *ad valorem*. So, any water-craft belonging to this company in 1876 and 1877 is also taxable.

6. We do not think that equity will allow penalties to be exacted in this case. The company seems to have acted with a desire to pay all the taxes it believed to be due, and tried to ascertain what was due in the manner pointed out by the act of 1874, and failed to make itself heard by the conduct of the comptroller-general in not sending it a schedule of full returns, but only of its income. It had the right to test the legality of the tax by the act of 1874, and the questions it has made are not such as appear to have been captiously made; but the matters of difference between itself and the state ought to have been legally and judicially settled and fixed, so that both parties might un

derstand their rights. Whilst corporations should be held to a strict compliance with law, and to the payment of taxes due by law, yet all their legal rights should be upheld just as fully and cheerfully by the state as the rights of any citizen within its limits. And inasmuch as by its legislation in 1874 and the following years, the state unquestionably indicated its wish that a fair trial on law and facts should be accorded to these corporations in respect to taxes levied by the comptroller-general against them, both as to law and fact; and as this corporation was misled by the officer of the state, so as thereby to lose its mode of testing these questions at law, we think that equity should secure to it a fair trial now both as to law and fact; as to fact, in ascertaining the property it has subject to tax, and the value thereof in 1876 and 1877, and as to law, in drawing the line between what is exempt or limited by charter and what is not.

The value of the branches which we hold liable will be ascertained in proportion to the business done upon them in connection with the main line. Some will be more others less valuable. We do not think that the proportion of number of miles alone of a branch to the entire line of the road is a fair test. Some branches are very valuable, some almost worthless on some roads. The value of these branches can be ascertained by the business done upon them in proportion to the general business of the road, and the real value of each at last is dependent on the business it does, and not alone on the length of its line. But where it is made part of the main line, and the new stock issued to build the branch is incorporated into the general stock, perhaps it is right that it should be valued in the proportion of its length to the length of the entire road.

7. Where the complainant enters into the court of equity, the universal rule is that it must do equity. And inasmuch as it owes the state taxes, in our judgment, on part of its property not covered by the limitation in its charter, it would seem perhaps equitable that it should pay interest,

from the time the tax was claimed by the officers of the state, at least; but as this would depend on facts which may shed further light in regard to whose fault caused the delay in its payment, we do not now positively decide this question. And indeed all the points decided may require revision when the case is fully tried and all the facts are brought out. The views given above are merely indications of what we now think, from our understanding of this record as it now appears.

Considering, however, that the judgment of the supreme court of the United States is confined to the question really made there, that is, what effect the consolidation of the Southwestern and Muscogee Railroads had on the limitation on the taxing power in the two charters, we are clear that the principle ruled by that court only covers those two roads and property belonging to each appurtenant thereto, and cannot be extended to branches which were constructed with different rights and privileges as to taxation, and to property not appurtenant.

But this company has been forced into a court of equity, and is entitled to relief therein. The judgment granting the writ of injunction until the hearing is therefore affirmed, and it is ordered that on the hearing the case be tried on its merits, and that such issues be made as shall bring out the whole truth on the facts, and the law as indicated above be applied to those facts, subject to be modified by the chancellor as facts other than those in this record may require.

Judgment affirmed, with directions.