## S07Q0957. RADIOSHACK CORPORATION v. CASCADE CROSSING II, LLC.

(653 SE2d 680)

CARLEY, Justice.

Pursuant to a written commercial lease agreement executed in 1995, RadioShack Corporation leases space at a shopping mall owned by Cascade Crossing II, LLC. That agreement contains an exclusivity clause, which permits RadioShack either to reduce its rent payments or to terminate the agreement if Cascade leases space at the mall to another tenant for a business which is similar to RadioShack's. The lease agreement also authorizes the prevailing party in any legal action to recover all reasonable expenses including attorney's fees. In 2000, RadioShack informed Cascade that its 1996 lease with another tenant violated the exclusivity clause. RadioShack also purported to exercise its right to reduce its rent payments retroactively.

Cascade brought suit against RadioShack in the United States District Court for the Northern District of Georgia for declaratory judgment, back rent, and attorney's fees and costs. On appeal from the grant of partial summary judgment, the United States Court of Appeals for the Eleventh Circuit determined that RadioShack had waived all of its rights under the exclusivity clause and that Cascade, as the only prevailing party, was entitled to attorney's fees and costs. *Cascade Crossings II v. RadioShack Corp.*, 131 FAppx. 191 (11th Cir. 2005). On remand, the parties agreed that the amount of back rent owed was $172,039, and the district court awarded Cascade the full amount of its attorney's fees and costs, which was approximately $280,000. On a second appeal, the Eleventh Circuit required the district court to explain the basis for its conclusion that OCGA § 13-1-11 (a) (2) did not limit attorney's fees to 15% of the first $500 collected and 10% of the remaining amount. *Cascade Crossing II v. RadioShack Corp.*, 171 FAppx. 329 (11th Cir. 2006). On the second remand, the district court explained that OCGA § 13-1-11 did not apply because Cascade sought not only past due rent, but also a declaration of rights under the lease agreement, as in *Insurance Indus. Consultants v. Essex Investments*, 249 Ga. App. 837, 844 (4) (549 SE2d 788) (2001). On a third appeal, the Eleventh Circuit certified the following question to this Court:

> Whether OCGA § 13-1-11 applies to and limits the award of attorneys' fees and costs in this particular case — where the landlord under a commercial lease agreement filed suit against a tenant seeking the collection of past due rent as well as a declaration of other contractual rights of the parties — and, therefore, precludes an award of full attorneys' fees and costs as provided in the lease agreement.

*Cascade Crossing II v. RadioShack Corp.*, 480 F.3d 1228, 1232 (11th Cir. 2007).

By its terms, OCGA § 13-1-11 (a) applies to "[o]bligations to pay attorney's fees upon any note or other evidence of indebtedness" which is collected through an attorney after maturity. We must first address whether a lease comes within this language, because the dissent has raised that issue and urged us to depart from settled Georgia law. Since the issue was first addressed in 1977, the Court of Appeals has repeatedly held that a lease constitutes an "evidence of indebtedness" under OCGA § 13-1-11. *Ranwal Properties v. John H. Harland Co.*, 285 Ga. App. 532, 536 (3) (646 SE2d 730) (2007); *Logistics Intl. v. RACO/Melaver*, 257 Ga. App. 879, 881 (2) (572 SE2d 388) (2002); *Insurance Indus. Consultants v. Essex Investments*, 249 Ga. App. 837, 844 (4) (549 SE2d 788) (2001); *Georgia Color Farms v. K.K.L.*, 234 Ga. App. 849, 852 (3) (507 SE2d 817) (1998); *Holmes v. Bogino*, 219 Ga. App. 858, 859 (2) (467 SE2d 197) (1996); *Burgess v. Clermont Properties*, 141 Ga. App. 112 (2) (232 SE2d 627) (1977). "In other cases, OCGA § 13-1-11 has been applied unquestioningly to provisions in leases authorizing the landlord to recover attorney['s] fees against a tenant in default. [Cits.]" *Holmes v. Bogino*, supra. Furthermore, the Court of Appeals has always included "commercial" leases in its holdings, and clearly has recognized that, in applying OCGA § 13-1-11 to a lease, "[t]he rent and other charges which the lease required tenants to pay constituted the principal amount of their debt." *Holmes v. Bogino*, supra at 860 (2).

This three-decade long line of consistent, uncontradicted precedent should not be swept aside based merely on a new analysis of the text and purpose of OCGA § 13-1-11 which differs from that enumerated in the many decisions cited above. We are not writing on a clean slate and, once the appellate courts interpret a statute,

> " ' " 'the interpretation . . . has become an integral part of the statute.' (Cits.) This having been done, (over a long period of history) any subsequent 'reinterpretation' would be no different in effect from a judicial alteration of language that the General Assembly itself placed in the statute. . . . " (Cit.)' (Cit.)" [Cit.]

*Harvey v. J. H. Harvey Co.*, 276 Ga. 762, 763 (582 SE2d 88) (2003). Application of this principle of statutory construction is not limited to those common instances where the same appellate court has already construed the statute, or " ' " 'where an amendment is presented to the legislature and . . . the statute is amended in other particulars.' " [Cit.]' [Cit.]" *Abernathy v. City of Albany*, 269 Ga. 88, 89 (495 SE2d 13) (1998) (recognizing that the statute is "particularly" applicable in the

latter situation). It is a logical fallacy to make the most common circumstances in which the rule may be employed the exclusive determinant of its application. This Court does properly consider the legislature's presumed knowledge of a Court of Appeals' opinion interpreting a statute. *Hart v. Owens-Illinois*, 250 Ga. 397, 400 (297 SE2d 462) (1982). When the General Assembly acquiesces in the construction of a statute by the Court of Appeals, the effect is not to bind this Court with that court's precedents in violation of the Constitution. To the contrary, the result is to establish the legislative intent of the General Assembly which binds this Court, as well as all others, in construing the statutory provision in issue. " 'The cardinal rule in construing a legislative act, is " 'to ascertain the legislative intent and purpose in enacting the law, and then to give it that construction which will effectuate the legislative intent and purpose.' " (Cit.)' [Cit.]" *Cox v. Fowler*, 279 Ga. 501, 502 (614 SE2d 59) (2005). Thus, it is sufficient that, in the 30 years since the decision in *Burgess*, "[t]here has been no attempt on the part of the legislature to alter the construction of" OCGA § 13-1-11 therein. *Georgia R. and Banking Co. v. Brown*, 86 Ga. 320, 323 (12 SE 812) (1890).

> Where a statute has, by a long series of decisions, received a judicial construction in which the General Assembly has acquiesced and thereby given its implicit legislative approval, the courts should not disturb that settled construction. [Cits.] "(E)ven those who regard 'stare decisis' with something less than enthusiasm recognize that the principle has even greater weight where the precedent relates to interpretation of a statute." [Cit.] A reinterpretation of a statute after the General Assembly's implicit acceptance of the original interpretation would constitute a judicial usurpation of the legislative function.

*Abernathy v. City of Albany*, supra at 90. Accordingly, a "reinterpretation" of OCGA § 13-1-11, accomplished through the failure to adhere to the long line of cases applying that provision to leases, would constitute an unauthorized change in an "integral" part of the statute. See *Abernathy v. City of Albany*, supra. If OCGA § 13-1-11 is to be revised so as to exclude "commercial leases," "the General Assembly, rather than the courts, must take that action." *Harvey v. J. H. Harvey Co.*, supra at 764.

Moreover, even if this Court could decide anew the proper construction of OCGA § 13-1-11, we would still arrive at the same conclusion as that which has long been expressed by the Court of Appeals. The phrase "evidence of indebtedness" cannot be considered a well defined term of art where, as here, there is an absence of

express legislative guidance. *Stillwell Enterprises v. Interstate Equipment Co.*, 266 SE2d 812, 816 (N.C. 1980) (construing the same phrase). The phrase clearly has a broader meaning than the term "note," and contemplates application of the statute to a variety of documents other than notes. See *Stillwell Enterprises v. Interstate Equipment Co.*, supra. Interpretation of the expression "evidence of indebtedness" so as to encompass both commercial paper and other documents is not foreclosed by unrelated instances in which that expression appears in connection with a statutory reference to commercial paper, and there are not any cases which draw a different conclusion. The only terminology in the statute which is ordinarily limited to commercial paper is "maker" and "endorser," and those terms are only used with the alternative "or party sought to be held on said obligation." OCGA § 13-1-11 (a) (3). A lessee obviously can be an obligor to whom the statute applies. Furthermore, the Court of Appeals has already demonstrated that the terms "principal," "interest," and "maturity," which are also found in the statute, can be and are properly used with respect to monetary obligations in leases. *Holmes v. Bogino*, supra; *Kasum Communications v. CPI North Druid Co.*, 135 Ga. App. 314 (217 SE2d 492) (1975).

A broad interpretation of the phrase "evidence of indebtedness" is also entirely consistent with subsection (b) of OCGA § 13-1-11, by which the statute is made applicable to "[o]bligations to pay attorney's fees contained in security deeds and bills of sale to secure debt." The express addition of the word "leases" was simply unnecessary. Leases are normally the only evidence of a tenant's debt, whereas a bill of sale or "deed to secure a note is probably not an evidence of indebtedness ([cit.]) . . . ." *Demere v. Germania Bank*, 116 Ga. 317, 318 (42 SE 488) (1902). Furthermore, the primary purpose for the enactment of subsection (b) was

> to provide for the collection of attorney's fees in cases where sales were made under powers of sale in instruments named. . . . [Subsection (b)], though not as specific as it might be, means that a liability for attorney's fees may be established where property is sold under powers of sale, without the necessity of obtaining a judgment for the fees.

*Cochran v. Bank of Hancock County*, 118 Ga. App. 100, 104-105 (3) (162 SE2d 765) (1968). This concern obviously does not apply to leases. Thus, subsection (b) was added to address security deeds and bills of sale to secure debt in light of their unique characteristics, and not to exclude leases or other documents which some might argue fall outside their narrow construction of the expression "evidence of indebtedness."

Accordingly, there is nothing in the language of OCGA § 13-1-11 to support a departure from the settled construction of the phrase "evidence of indebtedness" as used therein. Instead, the statutory language supports that long held construction. " '[T]hese provisions indicate, either explicitly or implicitly, that an evidence of indebtedness . . . is a writing which acknowledges a debt or obligation and which is executed by the party obligated thereby.' " *Stillwell Enterprises v. Interstate Equipment Co.*, supra at 817 (construing a statute very similar to OCGA § 13-1-11). See also *Broun v. Bank of Early*, 243 Ga. 319, 320, n. 2 (253 SE2d 755) (1979) ("A guaranty contract is an 'evidence of indebtedness' within the meaning of [OCGA § 13-1-11]. [Cit.]"). Compare *T.F. James Co. v. Vakoch*, 628 NW2d 298, 301 (II) (A) (N.D. 2001) (construing a statute which declared attorney's fees provisions in evidences of debt void, distinguishing jurisdictions such as Georgia and North Carolina, which "have concluded a lease is evidence of debt, but their conclusions allowed, rather than disallowed, attorney fees").

An analysis of the intent of OCGA § 13-1-11 also indicates that the phrase "evidence of indebtedness" should be construed broadly so as to encompass leases.

> [T]his statute is not one which must be strictly construed. . . . [A]n undertaking to pay attorney's fees in addition to principal and interest is in the nature of an agreement for a penalty, and the statute under consideration is to take away the penalty in certain cases, and is remedial.

*Demere v. Germania Bank*, supra. Thus, the purpose of OCGA § 13-1-11 is to prevent a contractual provision for attorney's fees from constituting a penalty for failure to pay an indebtedness. *General Elec. Credit Corp. of Ga. v. Brooks*, 242 Ga. 109, 113 (249 SE2d 596) (1978). In its current form, the statute accomplishes this purpose in subsections (a) (1) and (2) by limiting the amount of attorney's fees, and in subsection (a) (3) by giving the debtor notice and "an opportunity to meet his obligation without incurring additional expenses in the nature of attorney['s] fees." *General Elec. Credit Corp. of Ga. v. Brooks*, supra at 114. See also *Talmadge v. Respess*, 224 Ga. App. 768, 773 (4) (b) (482 SE2d 709) (1997). Obviously, a tenant who is sued for failure to pay rent may have as great a need for all of these protections, and as little bargaining power to avoid the insertion of an unreasonable provision for attorney's fees, as an obligor on a note or other commercial paper.

Consistent with the statutory intent, our holding encompasses commercial leases as well as residential and other non-commercial leases. Nothing in the language of OCGA § 13-1-11 limits its benefits

to non-commercial debtors. Likewise, the statute applies to all notes and other commercial paper without regard to the nature of the underlying transaction. Moreover, an ordinary business debtor may have unequal bargaining power and a need for the protections of OCGA § 13-1-11 which is comparable to that of a typical individual debtor. In any event, a distinction between commercial and other leases is without any basis in either logic or the statutory text.

Accordingly, we hold that the term "evidence of indebtedness," as used in OCGA § 13-1-11,

> has reference to any printed or written instrument, signed or otherwise executed by the obligor(s), which evidences on its face a legally enforceable obligation to pay money. Such a definition . . . does no violence to any of the statute's specific provisions and accords well with its general purpose . . . .

*Stillwell Enterprises v. Interstate Equipment Co.*, supra. That definition includes all written leases which impose on the lessee an obligation to pay money. The lease in this case imposed such an obligation on RadioShack, which is being enforced by the federal district court pursuant to a consent order awarding past due rent and interest to Cascade. Thus, OCGA § 13-1-11 is applicable even though Cascade also sought a declaration of contractual rights, and Radio-Shack is continuing to possess and pay rent for the leased property. The statute applies at least where, as here, past due rent is recovered, and the only other relief is declaratory and governs the future enforceability or amount of the tenant's rent obligation. Compare *Insurance Indus. Consultants v. Essex Investments*, supra at 844 (4). To hold otherwise would create distinctions that have no basis in the statutory language and purpose. Therefore, OCGA § 13-1-11 applies to the lease between Cascade and RadioShack and requires that the certified question posed by the Eleventh Circuit be answered in the affirmative.

*Certified question answered. All the Justices concur, except Sears, C. J., Benham and Thompson, JJ., who dissent.*

SEARS, Chief Justice, dissenting.

The majority takes me to task for suggesting that we should independently review the text, history, and purpose of OCGA § 13-1-11 and decide for ourselves the legislative intent of the phrase "any note or other evidence of indebtedness." According to the majority opinion, once the Court of Appeals has interpreted a statute in a particular manner for a sufficiently long period of time, this Court must defer to that construction as though it had become part of the statutory text. In support of this notion, the opinion relies heavily on

two cases holding that where this Court has definitively construed particular statutory language, and the General Assembly later amends the statute in other respects but leaves the language on which this Court based its construction intact, the prior construction of the particular statutory language controls.[1]

There is a profound difference between recognizing that considerations of stare decisis are at their apex when the General Assembly has arguably approved this Court's prior construction of specific statutory language, albeit implicitly, and contending, as the majority opinion does, that the Court of Appeals has the power to bind this Court by deciding a question of statutory interpretation incorrectly and then following its own erroneous precedent for a sufficient length of time. The majority opinion's position on this point contradicts the Georgia Constitution of 1983, which states plainly that "[t]he decisions of the Court of Appeals . . . shall bind all courts *except* the Supreme Court as precedents,"[2] and that "[t]he decisions of the Supreme Court shall bind *all* other courts as precedents."[3] Thus, this Court *is* writing on a "clean slate" where, as here, it must decide an issue of first impression regarding statutory interpretation, and prior interpretations by the Court of Appeals should be considered for their persuasive value only.

The majority opinion responds to this point by arguing that it is merely applying a rule of statutory construction, and that what binds this Court is not the Court of Appeals' 1977 decision in *Burgess v. Clermont Properties, Inc.*,[4] but rather the unexpressed intent of the General Assemblies convened after 1977 that chose not to amend the statute in a way that would effectively overrule the Court of Appeals' interpretation. Of course, it is this Court's own misapplication of the rules of statutory construction that elevates the Court of Appeals' erroneous statutory interpretation to the legal equivalent of the affirmatively expressed intent of later General Assemblies. In other words, the majority's response is completely circular.

It is undisputed that the General Assemblies convened after 1977 have passed no legislation indicating whether they agree or disagree with the Court of Appeals' decision in *Burgess*. I think we would do better to heed the United States Supreme Court's oft-repeated warning about reading too much into legislative silence and inaction. As the high court has explained:

---

[1] *Harvey v. J. H. Harvey Co.*, 276 Ga. 762, 762-764 (582 SE2d 88) (2003); *Abernathy v. City of Albany*, 269 Ga. 88, 88-90 (495 SE2d 13) (1998).

[2] Art. VI, Sec. V, Par. III (emphasis supplied).

[3] Art. VI, Sec. VI, Par. VI (emphasis supplied).

[4] 141 Ga. App. 112 (232 SE2d 627) (1977).

> Legislative silence is a poor beacon to follow in discerning the proper statutory route. . . . The verdict of quiescent years cannot be invoked to baptize a statutory gloss that is otherwise impermissible. This Court has many times reconsidered statutory constructions that have been passively abided by Congress. Congressional inaction frequently betokens unawareness, preoccupation, or paralysis. "It is at best treacherous to find in Congressional silence alone the adoption of a controlling rule of law." *Girouard v. United States*, 328 U. S. 61, 69 (1946). . . . Where, as in the case before us, there is no indication that a subsequent Congress has addressed itself to the particular problem, we are unpersuaded that silence is tantamount to acquiescence, let alone . . . approval. . . .[5]

Put another way, "[t]o explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities."[6] It is primarily the responsibility of this Court, not the General Assembly, to correct errors of statutory interpretation by the Court of Appeals, and we should not place this burden on the General Assembly's shoulders.[7]

I turn now to the question certified to this Court by the United States Court of Appeals for the Eleventh Circuit ("Eleventh Circuit").[8] RadioShack contends that OCGA § 13-1-11 applies to this case and limits the amount Cascade can recover in attorney fees after successfully prosecuting its suit to enforce the lease agreement. In support of this proposition, RadioShack relies on a line of cases from

---

[5] *Zuber v. Allen*, 396 U. S. 168, 185 & n. 21 (90 SC 314, 24 LE2d 345) (1969).

[6] *Helvering v. Hallock*, 309 U. S. 106, 119-120 (60 SC 444, 84 LE 604) (1940).

[7] See *Girouard v. United States*, supra, 328 U. S. at 69-70 ("We do not think under the circumstances of this legislative history that we can properly place on the shoulders of Congress the burden of the Court's own error.").

[8] Georgia law authorizes this Court to answer certified questions from any state appellate court, any federal district court or court of appeals, and the United States Supreme Court. Ga. Const. Art. VI, Sec. VI, Par. IV; OCGA § 15-2-9; Ga. Supreme Court Rules 46-48; cf. Uniform Certification of Questions of Law [Act] [Rule] §§ 1-14 (1995), 12 U.L.A. 71-79 (Supp. 1997). For an in-depth discussion of the history, purpose, and proper use of inter-jurisdictional certification procedures, see 17A Charles Alan Wright, Arthur R. Miller, Edward H. Cooper & Vikram David Amar, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 4248, at 482-516 (3d ed. 2007). See also *City of Houston, Tex. v. Hill*, 482 U. S. 451, 470-471 & n. 22 (107 SC 2502, 96 LE2d 398) (1987) (where a legislative enactment is neither ambiguous nor obviously susceptible of a limiting construction, "[a] federal court may not properly ask a state court if it would care in effect to rewrite a statute" through use of the certification procedure); *Tarr v. Manchester Ins. Corp.*, 544 F2d 14, 15 (1st Cir. 1976) ("The purpose of certification is to ascertain what the state law is, not, when the state court has already said what it is, to afford a party an opportunity to persuade the court to say something else.").

the Court of Appeals beginning in 1977[9] holding or stating that a commercial lease constitutes an "evidence of indebtedness" within the meaning of OCGA § 13-1-11.[10] RadioShack maintains that the factual and procedural dissimilarities between this case and the Court of Appeals' precedents are distinctions without a difference.

In response, Cascade correctly asserts that this Court has never decided whether a commercial lease constitutes an "evidence of indebtedness" under OCGA § 13-1-11, and the case thus presents a question of first impression in this Court. Cascade also notes that the General Assembly first adopted the relevant statutory language in 1891,[11] yet it was not until more than 80 years later that the Court of Appeals itself first held that the statute applies to commercial leases. According to Cascade, the Court of Appeals took a wrong turn in *Burgess* in 1977 and has simply been following that erroneous precedent ever since. Alternatively, Cascade argues that this case is factually and procedurally distinguishable from the Court of Appeals' decisions on which RadioShack relies because RadioShack is still in possession of the premises, Cascade sued for more than just unpaid rent, and the attorney fees clause is part of a negotiated bilateral agreement between sophisticated commercial entities.

In my view, Cascade has the better argument. The Court of Appeals' decision in *Burgess* extended OCGA § 13-1-11 well beyond its intended scope. The phrase "evidence of indebtedness" has the ring of a term of art, a suspicion supported by an examination of the terminology used throughout the rest of the statute. The statute opens with a declaration that an agreement to pay attorney fees "upon any note or other evidence of indebtedness" in addition to interest is valid and enforceable as part of the underlying debt when collected "by or through an attorney after maturity" as long as certain conditions precedent have been met.[12] Specifically, the "holder" of the note or other evidence of indebtedness is required, "after maturity of the obligation," to notify the "maker, endorser, or party sought to be held on said obligation" in writing that it intends to enforce the

---

[9] *Burgess*, supra, 141 Ga. App. at 112 (2) ("[W]e find no reason why a lease may not be an 'evidence of indebtedness.' ").

[10] See *Logistics Intl. v. RACO/Melaver, LLC*, 257 Ga. App. 879, 881 (2) (572 SE2d 388) (2002) ("Under Georgia law, a lease can be 'evidence of indebtedness' within the meaning of OCGA § 13-1-11."); *Ins. Indus. Consultants v. Essex Investments*, 249 Ga. App. 837, 844 (4) (549 SE2d 788) (2001) (same); *Ga. Color Farms v. K.K.L., L.P.*, 234 Ga. App. 849, 852 (3) (507 SE2d 817) (1998) (same); *Holmes v. Bogino*, 219 Ga. App. 858, 859 (2) (467 SE2d 197) (1996) (same); see also *Duff's Enterprises v. B.F. Saul Real Estate Inv. Trust*, 170 Ga. App. 9, 10 (1) (316 SE2d 21) (1984) (applying OCGA § 13-1-11 in commercial lease case); *Kasum Communications v. CPI North Druid Co.*, 135 Ga. App. 314, 314-315 (217 SE2d 492) (1975) (same).

[11] 1890-91 Ga. Laws (vol. 1), p. 221.

[12] OCGA § 13-1-11 (a).

agreement to pay attorney fees and that the debtor has "ten days from the receipt of such notice to pay the principal and interest without the attorney's fees."[13] The statute specifies that refusal of "a debtor" to accept delivery of the required notice is the equivalent of notice.[14]

The statute provides that if the conditions precedent have been met, then the agreement to pay attorney fees is enforceable. However, even when the agreement is enforceable, the statute limits the amount of attorney fees the holder of the note or other evidence of indebtedness can recover from the debtor. If the debt instrument "provides for attorney's fees in some specific percent of the principal and interest owing thereon," the agreement to pay attorney fees is enforceable "up to but not in excess of 15 percent of the principal and interest owing on said note or other evidence of indebtedness."[15] If the debt instrument provides for the payment of "reasonable attorney's fees without specifying any specific percent," the attorney fees provision is construed to require payment of "15 percent of the first $500.00 of principal and interest owing on such note or other evidence of indebtedness" plus "10 percent of the amount of principal and interest owing thereon in excess of $500.00."[16] "[S]ecurity deeds" and "bills of sale to secure debt" are expressly included in the coverage of the statute.[17]

It is obvious from context that not every scrap of paper with a writing scribbled on it qualifies as a "note" within the meaning of the statute. The statute's repeated use of terminology drawn from the world of banking and commercial paper — "principal," "interest," "maturity," "holder," "maker," "endorser," "debtor," "security deed," and "debt" — tells us that OCGA § 13-1-11 employs the word "note" in the far more limited sense of "a written paper acknowledging a debt and promising payment."[18] It is equally clear that the word's constant companion in the statute, "evidence of indebtedness," has a similarly limited meaning. In order to constitute an "evidence of indebtedness" under OCGA § 13-1-11, the writing in question must at least share the attributes of a "note" rendered critical by the statutory text, namely, a designation of the "principal," "interest," and date of "maturity." Commercial leases generally do not refer to "principal," "interest," or a date of "maturity," nor does the specific lease in question. In common parlance, it would be quite odd to hear someone

---

[13] OCGA § 13-1-11 (a) (3).
[14] OCGA § 13-1-11 (a) (3).
[15] OCGA § 13-1-11 (a) (1).
[16] OCGA § 13-1-11 (a) (2).
[17] OCGA § 13-1-11 (b).
[18] *O'Brien's Irish Pub v. Gerlew Holdings*, 175 Ga. App. 162, 166 (4) (332 SE2d 920) (1985) (quoting *Kirkland v. Bailey*, 115 Ga. App. 726, 728 (155 SE2d 701) (1967)).

referring to his or her unpaid rent as "principal" or describing the date the rent check is due as the "date of maturity."[19]

Rejection of RadioShack's attempt to shoehorn its lease with Cascade into OCGA § 13-1-11 finds further support in the use of the term "evidence of indebtedness" in other legal sources around the time of the statute's adoption in 1891.[20] For years, the General Assembly had been using the phrase "evidence of indebtedness" in connection with banks and various types of commercial paper.[21] Contemporaneous decisions of both this Court[22] and the United States Supreme Court[23] reflect a similar pattern of usage. Moreover, Georgia law employed the phrases "evidence of debt" and "evidence of

---

[19] The majority opinion erroneously states that "[t]he only terminology in the statute which is ordinarily limited to commercial paper is 'maker' and 'endorser,' and those terms are only used with the alternative 'or party sought to be held on said obligation.' " The statute also employs the terms "maturity" and "holder," both of which are generally limited to the field of commercial paper when used in connection with writings. See *Black's Law Dictionary* 423, 749 (8th ed. 2004) (defining "date of maturity" as "*Commercial law.* The date when a debt falls due, such as a debt on a promissory note or bond," and "holder" as "[a] person who has legal possession of a negotiable instrument and is entitled to receive payment on it" or "[a] person with legal possession of a document of title or an investment security").

[20] The legislative history available for the original act itself, such as it is, sheds little light on the question at issue in this case. See *Journal of the Senate* 48-49 (July 10, 1891).

[21] See, e.g., 1890-91 Ga. Laws (vol. 2), p. 136, § 2 (authorizing transfer of "all the assets, property, obligations to, and *evidence of, indebtedness* [sic] belonging to [a] private banking company" to "the Bank of Sumter incorporated by this charter" and providing that "in said corporate name it may sue for, collect and enforce all such obligations or *evidences of indebtedness* to said private banking company") (emphasis supplied); 1890-91 Ga. Laws (vol. 1), p. 143, § 6 (relating to "suit[s] . . . brought upon any *evidence of indebtedness* given for [the purchase of] fertilizer") (emphasis supplied); 1888-89 Ga. Laws (vol. 2), p. 603, § 5 (incorporating the Rome Banking and Trust Company and authorizing it to "purchase, sell or exchange bonds, stocks, bills of exchange, coin and bullion; to discount and negotiate notes and drafts, bills of exchange and *other evidences of debt*; . . . [and] to receive and keep on special deposit all valuables, such as gold, silver or paper money, bullion, precious metals, jewels, plate, certificates of stock or *evidence of indebtedness*, deeds or muniments of title, or other valuable papers of any kind") (emphasis supplied); 1878-79 Ga. Laws, p. 184, § 4 (capping interest rate legally chargeable at 8% generally and at 7% absent a special showing "upon any account, note, bond, bill, draft or *other evidence of indebtedness*") (emphasis supplied); 1866 Ga. Laws, p. 139, § 1 (providing for establishment of lost or destroyed documents "in all cases where suit may have been instituted on any bond, bill, note, draft, check, or *other evidence of indebtedness*") (emphasis supplied).

[22] See, e.g., *Brooks v. Fowler*, 82 Ga. 329, 333 (9 SE 1089) (1889); *Crawford v. Pritchard*, 81 Ga. 14, 17-18 (6 SE 689) (1888); *Rutledge v. Hudson*, 80 Ga. 266, 268-269 (5 SE 93) (1887); *Tumlin v. Vanhorn*, 77 Ga. 315, 318, 321 (3 SE 264) (1887); *Crane v. Goodwin*, 77 Ga. 362, 364 (1886); *Nat. Bank of Augusta v. Cunningham*, 75 Ga. 366, 367 (1885); *Thompson v. Mitchell*, 74 Ga. 797, 798-799 (1885); *Littlefield & Bro. v. Clary*, 66 Ga. 322, 323-324 (1881); *Colquitt & Baggs v. Stultz*, 65 Ga. 305, 308 (1880); *Carter v. Monroe*, 65 Ga. 542, 544, 546 (1880); *Wright v. South-Western R.R. Co.*, 64 Ga. 783, 799 (1880).

[23] See, e.g., *Nat. Sec. Bank v. Butler*, 129 U. S. 223, 226 (9 SC 281, 32 LE 682) (1889); *Missouri v. Walker*, 125 U. S. 339, 340, 343 (8 SC 929, 31 LE 769) (1888); *Tua v. Carriere*, 117 U. S. 201, 202 (6 SC 565, 29 LE 855) (1886); *Hagood v. Southern*, 117 U. S. 52, 65 (6 SC 608, 29 LE 805) (1886); *Nat. Bank v. Johnson*, 104 U. S. 271, 276-277 (26 LE 742) (1881).

indebtedness" interchangeably,[24] and *Black's Law Dictionary*, which was first published around the same time, specifically defined the phrase "evidence of debt" as "[a] term applied to written instruments or securities for the payment of money, importing on their face the existence of a debt."[25]

The statute now codified at OCGA § 13-1-11 has been amended only a handful of times since its enactment in 1891, most significantly in 1900 and 1953.[26] However, none of the amendments even remotely suggests an intent on the part of the General Assembly to expand the meaning of "evidence of indebtedness" to include commercial leases.[27] It is also worth noting that another Georgia statute currently in force specifically defines the term "[e]vidence of indebtedness" as "a note, draft, or similar negotiable or nonnegotiable instrument."[28]

Finally, the construction I would place on OCGA § 13-1-11 better accords with the statute's established purpose of protecting relatively economically powerless borrowers from sharp dealing by unscrupulous lenders. As this Court explained over a century ago:

> Before the passage of this act [in 1891], a stipulation to pay attorney's fees subjected the debtor to a penalty for a failure to pay his indebtedness, even though he honestly could not pay, and made no resistance to the creditor's suit. This was the evil at which the act was directed, the remedy being to relieve the debtor from the payment of attorney's fees except where he litigated with the creditor, and resisted the suit on grounds which were not in any part upheld, except where "a plea [was] filed by the defendant and not sustained."[29]

As the Court correctly notes, a tenant sued for past due rent by her landlord may be as deserving of protection from an unfair attorney fees clause as a strapped borrower who takes out a loan from the bank. However, that fact does not provide us with a basis for expanding the scope of OCGA § 13-1-11 beyond what the General

---

[24] See, e.g., Ga. Const. of 1868, Art. V, Sec. XVII.

[25] *Black's Law Dictionary* 442 (1st ed. 1891).

[26] 1968 Ga. Laws, p. 317, § 1; 1957 Ga. Laws, p. 264, § 1; 1953 Ga. Laws (Jan.-Feb. Sess.), pp. 545-547, § 1; 1946 Ga. Laws, p. 766, § 1, Ex. 2-B; 1900 Ga. Laws, p. 53, § 1.

[27] In 1978, the year after the Court of Appeals decided *Burgess*, we thoroughly reviewed the development of the statutory text over time. *Gen. Elec. Credit Corp. of Ga. v. Brooks*, 242 Ga. 109, 112-114 (249 SE2d 596) (1978).

[28] OCGA § 7-1-4 (18).

[29] *Demere v. Germania Bank*, 116 Ga. 317, 319 (42 SE 488) (1902); see *Miller v. Roberts*, 9 Ga. App. 511, 515-516 (71 SE 927) (1911) ("It is a familiar notion, often given expression in our jurisprudence, that it is one of the objects of the law to prevent debtors, urged by the pressure of the necessity of securing credit, or money, or extension of indebtedness, from yielding to such unjust or unreasonable exactions as a hard creditor may see fit to make.").

Assembly that enacted it intended. Moreover, a year before the Court of Appeals decided *Burgess*, the General Assembly chose a different approach to address the potential for abuse of attorney fees clauses in residential lease agreements.[30]

The cardinal rule in statutory interpretation is to discern the legislative intent. In my view, the text, history, and purpose of OCGA § 13-1-11 all point in the same direction: the phrase "any note or other evidence of indebtedness" in OCGA § 13-1-11 was never intended to include routine lease agreements. Accordingly, I would hold that the statute does not apply to leases, disapprove the Court of Appeals' rulings to the contrary, and answer the Eleventh Circuit's certified question in the negative.

I am authorized to state that Justice Benham and Justice Thompson join in this dissent.

DECIDED OCTOBER 29, 2007 —
RECONSIDERATION DENIED DECEMBER 14, 2007.

*Drew, Eckl & Farnham, Bruce A. Taylor, Jr., Burke A. Noble,* for appellant.

*Hartman, Simmond, Spielman & Wood, David L. Pardue, Jill R. Johnson,* for appellee.

---

[30] The statute, now codified at OCGA § 44-7-2 (c), provides as follows:

A provision for the payment by the tenant of attorney's fees of the landlord upon the breach of a rental agreement by the tenant, which provision is contained in a contract, lease, license agreement, or similar agreement, oral or written, for the use or rental of real property as a dwelling place shall be void unless the provision also provides for the payment by the landlord of the attorney's fees of the tenant upon the breach of the rental agreement by the landlord.